# Exhibit 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
LATORIA GEORGE and JOHNNIE
RUSHING, ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED

                              CIVIL ACTION NO.
VS
                              3:25-cv-00168-JWD-EWD

STEVEN E. SANDERS, in his official
capacity as the East Baton Rouge
Parish Ward 3 District 2 Justice
of the Peace
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VIDEO DEPOSITION OF
STEVEN E. SANDERS, JUSTICE OF THE PEACE

Taken on Thursday, August 7, 2025
At the Office of the
ATTORNEY GENERAL
1885 N. 3rd Street, 6th Floor
Baton Rouge, Louisiana    70801

REPORTED BY:  JANICE WELCH, C.C.R.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

VERITEXT LEGAL SOLUTIONS

9522 BROOKLINE AVENUE, SUITE 217

BATON ROUGE, LOUISIANA 70809

PHONE: (225) 201-9650  \*  FAX: (225) 201-9651

E-MAIL: depos@courtreportersla.com

got my civil engineering degree in May of '86, and that's the undergrad.

Q   And then -- so you graduated undergrad in '86?

A   '86, uh-huh.

Q   And when did you begin attending law school?

A   In the fall of '86.

Q   And where did you attend law school?

A   The Paul M. Hebert Law School, LSU Law School.

Q   And when did you graduate from law school?

A   In May of '89.

Q   When were you admitted to practice law in Louisiana?

A   I think I was sworn in in October of '89. I think when the swearing in was.

Q   Are you admitted in any other jurisdictions?

A   No.

Q   When were you first elected to the bench?

A   In the fall of 1996, so I took office January 1, 1997.

Q   And you took office as Justice of the

STEVEN SANDERS                                    08/07/2025

Page 13

A    Yes.

Q    What was that firm?

A    Gunn, G-u-n-n, Smith and Forsancaster, LLP.  I don't know if it was an LLP or not back then.

Q    Judge Sanders, what do you see as your role as Justice of the Peace?

A    To adjudicate disputes.

Q    Have you -- can you describe the training requirements you must comply with as a Justice of the Peace?

A    Training requirements, once you're elected you are to undertake training offered by the Attorney General's Office.  It used to be an annual training, I want to say that law was passed in the '80s, maybe '90s sometime, and so, you know, I'll call it to the equivalent of continuing education, that's the term I'm better familiar with.  And then starting maybe four years ago they revamped it so now it's a rolling 12 hours-ish that you've got to get every two years.  Some of that can be done online, some of it in person, anyway --

Q    Does that 12 hours of training that you have to do every two years include any specific training on Louisiana eviction law and procedure?

A    Yes.  Just about every training offered by the Attorney General's Office there's an hour long or hour and a half long discussion about evictions.

Q    And can you describe generally what content is covered in that hour and a half long discussion?

A    I think in the discovery they gave you a copy or a piece of the AG training manual, basically it's everything start to finish what is basic lease law, what are grounds or possible grounds for eviction, how to, you know, hear the case, how to set the case, what to do once if a judgment of eviction is issued, et cetera.

Q    So it's pretty straightforward.  So basically it goes by the manual, it covers the content of the manual?

A    Uh-huh, yes.

Q    Does your office have West Law, LexisNexis or any other legal research platform subscription?

A    No.

Q    Do you keep up to date on First Circuit or Louisiana Supreme Court case law on evictions?

A    Occasionally, meaning because I'm an

attorney I have access to Fastcase on the Bar Association, so technically it's not even in the JP but I can access stuff and look at things there.

Q    How often would you say you check Fastcase for updates in the law?

A    Oh, man, maybe a couple of times a year.

Q    So you wouldn't -- would you receive any notice if a decision came down from the First Circuit that affects how you adjudicate evictions, would you receive any kind of notice of that when it happens?

A    No.

Q    The Attorney General's Office wouldn't notify you?

A    No.

Q    Judge Sanders, are you a landlord?

A    Yes.

Q    How many rental properties do you own?

A    Two.

Q    Are they here in Baton Rouge?

A    Technically, one is in Baton Rouge and one is in St. George City, in the corporation effort.

Q    Are each of those one unit properties or more than one unit?

some reason, I thought the PDF I attached was 2020, but it could be I got a newer map later on, but yes, it could be.

Q    Could be?

A    It probably is.

Q    Does it look similar?

A    Yes.

Q    Does it look identical to the map that you have on your Website?

A    Yes, I don't think anything has changed. Our boundaries were set back in 1980, I think it's 13:2602.

Q    And the green portion of the map is your geographic jurisdiction, Ward 3 District 2; is that correct?

A    Yes, the territorial jurisdiction.

Q    Territorial jurisdiction.  And is there any portion of your jurisdiction that overlaps with Baton Rouge City Court?

A    Yes.

Q    Which portions of your jurisdiction?

A    I wish this was blown up a little better. But do you see the different colors of green, I can point it to you but I don't think this is big enough for me to make out the precinct numbers.

shaded both green and gray, those are the portions that are overlapping jurisdiction between your court and City Court; is that right?

A   Yes.

Q   And for a landlord whose property is in one of those areas of overlapping jurisdiction, they could choose to file their eviction in your court or Baton Rouge City Court; is that right?

A   Sure, yes.

Q   They could also choose to file in district court, correct?

A   Yes.

Q   Okay.  How about the landlords in areas where there is no overlapping jurisdiction between Baton Rouge City Court and your court, those landlords could choose to file in your court or district court; is that right?

A   Wait, I'm sorry --

Q   Let me ask the question a different way. Outside of the areas where city court has overlapping jurisdiction, so in the areas where only your court is shown to have jurisdiction on this map, those landlords can also file in district court, right?

A   Sure, yes.

Q    So basically a landlord could choose in any part of your geographic or territorial jurisdiction to file in a different court, correct?

A    Yes.

Q    How does an eviction court -- I'm sorry, how does an eviction case end up in your court rather than in district court or in city court?

A    Your guess is as good as mine.  Somebody comes in and files a petition of eviction.

Q    What are the differences between your court and district court?

A    I hate to say it, do you want to qualify me as an expert and have you give me -- have me give you an opinion?

Q    Do you have --

A    I'm not trying to evade your question, I just don't know how to answer that without it being a legalistic lawyer discussion.

Q    Do you have any perception of what some of the differences are between your court and let's say city court?

A    City court is located downtown and my court is located off of South Sherwood Forest.

Q    Let me ask you some more specific questions.

A    The law -- the law on evictions, as I hope you're aware, is the same whether it's in my court, district court or city court.  So --

Q    When an eviction hearing occurs in your court is there a court reporter present?

A    No.

Q    If an eviction hearing takes place in city court or district court, is there a court reporter present; do you know?

A    I have no clue.

Q    When an eviction hearing occurs in your court, do you observe the rules of evidence?

A    Yes, per the Code of Civil Procedure for course of limited jurisdiction evidentiary rules are relaxed but the parties are still sworn in.

Q    So you observe relaxed evidentiary rules in your court?

A    Yes.

Q    Do you know, just from your legal education or experience as an attorney in private practice, whether relaxed rules of evidence are observed in city court or district court?

A    Antidotally I would say they're a little bit relaxed in city court.  District court, I would say they're relaxed in district court even if the

parties are pro se, which is mostly what you have in eviction proceedings.  So I would say they're relaxed in all three courts, because you have pro se litigants in almost every eviction case.

Q    You mentioned earlier that that Code of Civil Procedure specifically states that the rules of evidence are relaxed in your court; is that right?

A    Yes.

Q    Are you aware of whether any Louisiana statute allows for relaxed rules of evidence in district court or city court?

A    No.

Q    No, you're not aware?

A    Not aware.

Q    Do you allow hearsay in your court?

A    Limited, yes.

Q    Do you know if hearsay is allowed in city court or district court?

A    I don't know.

Q    Do you require the documents be formally introduced into evidence in your court?

A    No, not generally, as far as formally goes, we're not a court of record, so if they want to -- meaning there's nobody who's, because they

are not represented by counsel, no pro se litigant uses the words, I would like to formally offer and introduce Lease A into evidence.  That is not done.

Q    Do you require that they lay any kind of foundation for the evidence before you review it?

A    Yes, it's brief, but sure.

Q    Do you know whether evidence is required to be formally introduced in city court or district court?

A    By a pro se litigant or by somebody represented by counsel?

Q    Let's try both.  For a pro se litigant, do you know if city court and district court require the evidence be introduced formally?

A    I don't know that.  I don't think they would require it formally.  I think the judge from sitting on the bench would just verbally say, let me see a copy of whatever document is trying to be introduced.  I don't think he would, he or she, the judge would expect the litigant to formally use the words, I'm introducing this into evidence.  They wouldn't know to do it.

Q    But even a pro se litigant would understand how to explain that they know what the document is, right?

A    Sure.

Q    Do you think that a city court judge would require that?

A    The same way for a pro se litigant, sure.

Q    What about for a represented litigant, would city court or district court require that documents be formally introduced into evidence?

A    Probably be -- be a little more formal with somebody represented by counsel, that would be my guess.

Q    What are some of the benefits to a landlord to file in your court rather than in city court or district court?

MS. STARKS:

Objection, speculation.

A    I was going to say, I don't know if there are any benefits.  You have a hearing one way or the other.

Q    So you're not aware of any benefits?

A    I mean, what do you have, you have a hearing.  I don't know.

Q    If a landlord chooses to file an eviction case in your court, is there any procedure by which the tenant can remove or transfer it to city court or district court?

A    Remove or transfer it.  No.  They could -- well, if they were in one of the overlapping areas, maybe they could file a request that it be transferred but that's about the extent of it off the top of my head.

Q    Are you aware of whether there's any statute that says that they can transfer it in those areas of an overlapping jurisdiction?

A    It would just be an argument of venue.

Q    Okay, let's move on from territorial jurisdiction.  What is your jurisdiction as it relates to what cases can be filed in your court?

A    Sure.  We're limited by the amount of dispute.  Right now it stands at $5,000, it's been like that since 2008.  And by certainly subject matter jurisdiction, again, it's laid out in the Code of Civil Procedure, as well as in Title 13. We don't hear family stuff, we don't hear probate disputes over titles with respect to immovable property, juvenile cases, things like that.  Mostly contract disputes, evictions, ownership of immovables, whatever is laid out in the statutes.

Q    Judge Sanders, how is your court funded?

A    The court, we receive fees from suit filings.  Do you want me to talk about all sources?

term.

Q    Okay.  I'll come back to that question once we get a little more context.  So let's talk briefly about the funding you get from East Baton Rouge Parish, how often do they pay you?

A    Monthly.

Q    And you said it's $300 a month?

A    Yes.

Q    And what is that parish money for?

A    Availability to handle any criminal matters, we're committing magistrates, so we can handle search warrants and arrest warrants, we can handle litter violations, the parish has fluctuated over the years, sometimes they want to have a litter court and sometimes they don't, so it depends on whether a sheriff's deputy or somebody writes a litter citation, or the constable, whoever it may be.  But it's to be available to handle any criminal matters that need to be addressed.

Q    How often annually do you hear criminal matters?

A    Rarely ever.  Like never.  In East Baton Rouge they have commissioners in the 19th JDC who handle all of that stuff.

Q    So today in 2025 have you handled any

A    No, it's the 300 plus 100.

Q    Okay, so do you receive a total of $400 a month from the parish?

A    Yes.

Q    And $100 of that is from the state?

A    Correct.  And that's W2 income.  They take taxes out and whatever.

Q    So the full amount of 400 is on your W2?

A    Correct.  It used to not be like that years and years ago.  At some point it changed, it was 300, it seems like I was getting 100, a separate check, this was, I don't know, 12, 15 years ago.  At some point I don't know if they changed the law, which changed the accounting.  You got me, but at some point it was just 400 coming through the parish.

Q    In your time as Justice of the Peace, has the state always appropriated money for that $100?

A    No, I think that started 20-ish years ago.  And there is a reference -- well, it's in 25 -- 13:2591, I believe that's the reference for it.

Q    What is that money from the state for?

A    Just -- it's called supplemental pay, it's given to all law enforcement/judicial folks. So I think judges, JPs, constables, sheriffs.  I

A     That's all I need.

Q     Okay.  So your --

A     Everything else is just for convenience of the court.  As you're aware, litigants in JP court can do stuff orally.  So they can walk in and sit down at the desk with me and verbally say, I have this problem, I want to sue whoever.  I need a pen and paper, and make a copy of that.  Now, is that all I have?  Obviously not, you know, because it's so much easier obviously for the convenience of the public as well as myself to have a copy machine, to use a computer, to have a desk to sit at, to have chairs to sit at.  But all of that ebbs and flows.  I can hold court at my house, I don't have to have a telephone, I don't have to have the internet, I don't have to have a computer.  I don't have to have any of that if I don't want to.  It's strictly at my convenience and obviously for the convenience of the public who comes in and files.  But push come to shove, you know, if you look at any other JPs, not any, if you go to a lot of rural JPs and you see their expense, they don't have any, because they don't handle that many cases.  My expenses ebb and flow with volume of cases filed.

Q     Let's talk about the expenses that you do

A    So give the answer, revenue is money generated from the operation of a business.

Q    And you said you do not consider your court to be a business; is that right?

A    No, I do not.  I don't know too many businesses who are bound by the Judicial Code of Conduct.

Q    So the -- we talked about the word compensation, the $400 you receive from the parish and the state is compensation for your effort; is that right?

A    Yes.

Q    So that's money that is not for use to pay for your office chairs and pens and paper; is that right?

A    It is to use for that.  It's to use however I see fit.

Q    What about your rent, what is the source of funds for your monthly rent?

A    The 400 plus court cost.

Q    How much is your monthly rent?

A    Right now it's 870, for the -- when I moved there in '16, it was probably 820, and then it's bumped up roughly every two years since then. Prior to that the office was at 12728 Jefferson

You'd have to go look at the acts, ten years, eleven years.

Q    So, as soon as the legislature allowed you to allocate a fee for the purpose of paying a clerk, you hired your wife?

A    Well, it allowed us to have a clerk to begin with, prior to that time Jefferson Parish had clerks, no other JP court had clerks, no other JP court had deputy constables, so there was a move roughly ten-ish years ago.  I think the statute was, any parish over 400,000, which in the state at that time was Jefferson Parish.  So even though they didn't say Jefferson Parish, it was essentially written for Jefferson Parish.  So when they changed the statute, they included East Baton Rouge at that point and I think they started allowing deputy constables at that point also.

Q    Did anyone need to approve your decision to hire --

A    No.

Q    Let me just finish the question.  Did anyone need to approve your decision to hire Donna Sanders as your clerk?

A    No.

Q    Does she work full-time or part-time?

A    Part-time.

Q    How many hours a week?

A    They're roughly 9 to 1, Monday through Friday, and then a little before and a little after, just depends on the day.

Q    Outside of those hours does she do any work related to your court?

A    Sometimes she brings home papers to -- not papers, petitions if we need to bring them home and get them written up for the constable to go serve, but that's the exception, not the rule.

Q    So generally she works from 9 to 1 with a little before and a little bit after.

A    Uh-huh, yes.

Q    And what are her job duties?

A    Oh we, to process -- basically do the civil processing for any pleadings that come through the court.

Q    Does she --

A    I'm sorry, answer the phone.

Q    Any other duties?

A    Off the top of my head, that's it.

Q    Is she salaried or is she a contractor?

A    No, she's paid just like we are through fees.

A      Steven Sanders.

Q      Anybody else?

A      No.

Q      What account do you use to pay for the court expenses we discussed?  Like for example, what account do you use to pay for pen and paper?

A      Sure, I have an in and out, a separate account.  I have it labeled as my attorney account, it's just a label, so if you -- I think we provided it in discovery, you have the three notebooks, I have all of our deposits and you can see where at the end of the month, the columns are cleared out, money goes to the clerk, money goes to the constable, in this case, Chief Constable and two deputy constables, and money is transferred to, I'll call it an in and out account, and that's what's used to pay the expenses and whatever.

Q      So you -- if I understand correctly, you're saying that you control, first of all, the Justice of the Peace account; is that right?

A      Yes.

Q      And then you have a separate account that you're calling the attorney account, and you control that as well?

A      Yes.

Q    Do you have any control over the clerk of court account?

A    No, other than she's my wife and so she has access to stuff, the same way I've got access to stuff.  So control is a nebulous term for me.

Q    Are you named on the clerk account?

A    I do not think I am.  I'm almost positive I am not.

Q    You could verify that though if you checked?

A    Sure, sure.

Q    So at the end of every month you allocate all of the money in the Justice of the Peace account to those three accounts we just discussed; is that right?

A    Correct.

Q    And which account do you pay for your paper and pens?

A    The in and out account.

Q    The in at out account is the same as the attorney account?

A    Yes.

Q    And that account only includes your 50 percent, plus the $400?

A    Fifty percent.  The 400, I decided a long

time ago just to let it go into savings, the savings is in my name, I can transfer and monkey moon it around, transfer money around, that's a better way to say that.  I just let it go into savings.

Q    Do you transfer that monthly as well?

A    No.

Q    It just gets deposited straight into savings?

A    Into the savings account.

Q    Is that your personal savings account?

A    Yes.

Q    And do you ever pay for pens and paper out of that savings account?

A    No.  I mean, we'll move money around, as people do, but do I specifically say, I need to transfer money out of savings to pay for, you know, copy paper at Sam's Club?  No.

Q    So would you say as a general rule, you pay your expenses for furniture, paper and pens, copy machine, telephone, rent, out of your in and out/attorney account?

A    Generally, yes.

Q    Is there ever a time when you pay any of those expenses out of the clerk account?

attorney account into your personal savings account?

A    I don't know.

Q    Do you recall ever doing it?

A    Maybe to make a retirement IRA payment or something.

Q    Do you recall when you did that?

A    Oh, man, a couple of years ago.

Q    Does your in and out/attorney account function essentially as a personal checking account?

A    Yes.

Q    Do you have other personal checking accounts?

A    No.  I'm sorry, well, we have a community account, my wife and I have a community account. That's the only other account I can think of that's a checking account.

Q    How often do you transfer funds from your in and out/attorney account to your community checking account?

A    Almost never.

Q    Under what circumstances would you transfer money from your in and out account to your community checking account?

A       To pay bills.

Q       Personal bills?

A       Sure.  The in and out account is, I mean, my personal money at that point.  I mean, I do with it whatever.

Q       So after you pay the clerk's fee and the constable's fee out of the Justice of the Peace court account, you transfer your portion into the in and out/attorney account, right?

A       Yes.

Q       And that portion that you transferred into the in and out/attorney account is your money?

A       Yes.

MS. STARKS:

        Objection to the form of the question.

A       Yes.

Q       And you get to decide what to do with that money at that point?

MS. STARKS:

        Objection to the form of the question.

A       Yes.

Q       You get to decide what to do with the money that is in your in --

MS. STARKS:

        Objection to the form of the question.

MS. ADAMS:

Right, so I'm going to rephrase the question.

MS. STARKS:

Yes, rephrase the question.

BY MS. ADAMS:

Q    So the question is, you get to decide what -- do you get to decide what to do with the that is in your in and out/attorney account?

A    Yes.

Q    You could use that money to pay for your pens and papers for your court, right?

MS. STARKS:

Object to the form of the question.

MS. ADAMS:

You can answer.

MS. STARKS:

Rephrase the question.

MS. ADAMS:

I don't need to rephrase the question. He can answer.

MS. STARKS:

I asked you to rephrase the question. It's a leading question.

MS. ADAMS:

I can ask a leading question of this witness.

MS. STARKS:

Rephrase the question.

MS. ADAMS:

Do you need me to pull out the rule of evidence that says I can ask leading questions of this witness?

BY MS. ADAMS:

Q    Okay, you can answer the question.

A    Can I answer it, it shouldn't be a problem.

MS. STARKS:

Is it hard to rephrase the question?

BY MS. ADAMS:

Q    Could you use the money out of your in and out/attorney account to pay for your pens and papers for your court?

A    Yes.

Q    Could you use that money to pay for the rent for your court?

A    Yes.

Q    Could you use it to pay for personal expenses?

A    Yes.

Q    Could you use it to pay for a vacation?

A    Yes.

Q    Could you, if you decided to not renew your lease and hold rent -- hold court out of your house, you wouldn't have to pay rent anymore, right?

A    Correct.

Q    And then you would have more money in your in and out/attorney account to use for whatever expenses you want, right?

A    Yes.

Q    And that would include personal expenses, correct?

A    Yes.

Q    Judge Sanders, you said before that your court does not have a budget; is that still accurate?

A    Yes.

Q    Why is that?

A    I don't need a budget.

Q    And why don't you need a budget?

A    I pay expenses as they arise.

Q    So you have certain -- you have certain expenses that you know that you have to pay every month, right?

Veritext Louisiana-CRLA/goDEPO    cs-Louisiana@veritext.com
A Veritext Company
www.veritext.com

going to be 15D -- I'm sorry, 15B.

          MS. STARKS:

               Is that going to be Exhibit 3?

          MS. ADAMS:

               That's going to be Exhibit 3, thank you.

     Exhibit 3 will be a copy of Revised Statute

     13:2590.

               (The document referred to by counsel was

               marked and attached to the deposition as

               Exhibit 3.)

BY MS. ADAMS:

     Q    Have you had an opportunity to review

revised statute 13:2509B?

     A    Yes.

     Q    So is it fair to say that the $60 you

deposit into the in and out/attorney account at the

end of the month from that filing, you're entitled

to that money under Revised Statute 13:2590B?

     A    Yes.

     Q    And at that point it becomes your money

when it gets deposited into that account?

     A    Again, --

     Q    Let me rephrase the question.

     A    I'm trying not to mischaracterize it but,

like I said, as a really hypertechnical matter,

we'll take one case filed in a whole month, one case filed on August 15, that's all there is, that's all that's filed. Does it be quote unquote, "become" you know, it's fees and compensation, does it become fees and compensation or August 31 or does it become fee and compensation on August 15 when it's filed? I hate to split hairs but it becomes fee and compensation on August 15, technically when they give it. It's a little -- because we obviously have more than one case filed, it would be a mealy to make those kind of transfers and cut checks for every single case filed. But as a, again, as a hypertechnical matter, it's fee and compensation when it's paid.

Q    Let me ask the question a little bit of a different way. Once the $60 is deposited into the in and out/attorney account at the end of the month, that's when you can start using that money for personal expenses, correct?

A    No, that's not correct. I can technically be using it -- I'm going back to the example of the one case filing, I can technically start using it right then. I choose not to do that because it's unwieldy to do it that way. You accumulate the money and pay it out -- we could do

all that he is not getting the money he is, quote/ unquote, "deserves." Like I said, I treat it as a quasi trust account in the sense of I want it to be just really one thing. I don't want to mix apples and oranges the best I can.

Q   Because if you pay for personal expenses out of the Justice of the Peace court account, there's a risk that you could cut into the portion that belongs to the constable or the clerk; is that what I'm understanding?

A   Yes. You know, like I said, the last thing I want to do is -- round numbers, for whatever reason, I mean, you know, if his portion is 60 and for some reason I wrote an $80 check, that's shorting him 20 bucks. You know, I don't want to do that. Or even run the risk of it. Checks bounce occasionally, just had a -- I just got notified yesterday that a $60 check bounced, so now I've got to go back and find whoever paid the $60 check and go run that down. Sometimes there's bigger checks than that that bounce. So all that plays into everything, and so again, that's why we try to do this once at the end of the month, so to keep things nice and clean.

Q   So, if I understand correctly, you're

saying that the $60 in this case, as soon as it hits the Justice of the Peace account, that portion is your money, right?

A    Yes.

Q    And you can use it for what you want, correct?

A    I could, sure.

Q    You could in theory use it for personal expenses.

A    Sure.

Q    Is that a yes?

A    Yes, yes.

Q    Okay, does this deposit book, does it track weddings as well?

A    No.

Q    Okay, where do you keep track of weddings?

A    I don't.

Q    How do you know --

A    Well, I guess I should be a little better about that.  So I keep a copy -- kept a copy of every marriage license and I write on the back, paid $100 or no charge, depends.  So at the end of the month if I did ten weddings, I could look at it and know that it's in theory, ten weddings, $100,

A    Sure.  It's 60, 60 because they got two writs, 60 and 60, clerk per 2590.1, there's no money allocated to the clerk with respect to a Writ of Possession.

Q    And just terminology wise, a Writ of Possession is the same as a Writ of Execution?

A    I call it a Writ of Possession.

Q    Writ of possession, okay.  Is a Writ of Possession the same thing as a warrant for possession under --

A    Yes, yes, under 40 -- CCP 47, whatever it is, 32, 34, somewhere, whatever that is.

Q    4733?

A    Close enough.

Q    Okay, are these entries in this document made contemporaneously?

A    Yes.

Q    Do you track civil filing fees in any other place besides this document?

A    No, no.

Q    Do you keep any electronic record of fees received in civil cases?

A    No.  Well, let me back up.  I have Quicken.  Do I have a line -- do I keep it by line item?  No, only by deposit, generic, court cost,

BY MS. ADAMS:

Q    Judge Sanders, do you recognize this document?

A    Yes.

Q    What is this?

A    This is from my Website where one of the links is to court cost and forms.

Q    How much do you charge for a new eviction proceeding?

A    150.

Q    Is there an additional cost for additional defendants?

A    Yes, well, yes, and 25 for each additional defendant.

Q    Okay.  Does that fee include service of the petition of eviction on the -- an order on the tenant?

A    Yes.

Q    Do you charge the same amount in every case?

A    Yes.

Q    And how is that fee determined?

A    By the statute.

Q    So previously we looked at Exhibit 3 Revised Statute 13:2590.  What does the statute

say?

A    Well, it's 2590 and 90.1 because that's how you get to the 150, correct?  It's 60 -- it's 120 plus thrust $30 clerk fee, so that's why at the very top where it says LSA-R.S. 13:2590 and 2590.1. So it's two statutes together.

Q    Okay.  Let's start with 2590, so that's Exhibit 3.  Do you still have a copy of Exhibit 3?

A    I do.

Q    Great.  What does 13:2590 say you can charge for an eviction?

A    120.

Q    And are you charging the maximum amount you can charge under the statute?

A    Under the two statutes, yes.

Q    Okay, let me -- let's skip around a bit. So I'm going to show you, so we can put it in the record, 2590.1.  That's tab 15C.  And we'll mark this as Exhibit 5.  That's revised statute 13:2590.1.

(The document referred to by counsel was marked and attached to the deposition as Exhibit 5.)

BY MS. ADAMS:

Q    Okay, you already referenced this but

13:2590.1, how much does this statute allow you to charge for the clerk's fee when someone files an eviction?

A    2590.1 B2, Eviction Proceeding, $30 plus $25 for additional defendant.

Q    Okay.  So assuming no additional defendants, we have $30 from 2590.1 and $120 from 2590, did I get that right?

A    Yes.

Q    So the total amount is 150, right?

A    Yes.

Q    And that's how much you charge?

A    Yes.

Q    So is it fair to say that you charge the maximum amount you can charge under these two statutes?

A    Yes.

Q    And you decided to charge the maximum?

A    Yes.  Consistency.  I think if I charged less and did it consistently then I'm favoring the landlord and would be accused of bias that way.  So I'm just charging what the statute says.

Q    The statute says you could charge up to the following amounts, right?

A    It does say that.

do that, you know.

Q    How often in a month do tenants file an answer formally?

A    In a month?  None.

Q    How about in a year?

A    In a year, four or five times.

Q    Are they usually represented?

A    Yes.  Or if they read my Website, it says in there, it encourages tenants to file an answer. So once -- there might be one or two who aren't represented who bring in an answer.  I've gotten sovereign citizens that come in and file an answer, just always an interesting experience.  But by and large, yes, they're represented by counsel.

Q    Let's go back briefly to Revised Statute 2590, Exhibit 3.  Do you have that in front of you?

A    Yes.

Q    Can you read the first line under 2590A?

A    Sure.  "Justice of the Peace may demand and receive up to the following amounts in all civil matters."

Q    The statute doesn't say that the constable may demand and receive up to the following amounts; is that correct?

A    Correct.

Q    So under the statute you are the one who gets to demand the filing fee; is that right?

A    That's how the statute reads.

Q    So when you said earlier that it's partially the constable's choice how much to charge, that's not what the statute says, correct?

A    As you're phrasing it, correct.  But a constable is not going to work for free.  So I can say it all day long, I'm only going to demand $10 and the constable is not going to go out there and serve the paper, theoretically, for $5.  He's not going to do that.  So the language of the statute versus the reality of life is two different things.

Q    So just looking at the language of the statute, the statute authorizes you and only you to decide the filing fee.

A    Correct.

Q    Correct?

A    Sure.  Yes.

Q    And let's turn to 2590.1, that's Exhibit 5.  Can you read the first line of subsection B?

A    Sure, "A Justice of the Peace in East Baton Rouge Parish and Jefferson Parish may demand and receive up to the following amounts in addition to or in lieu of the cost provided for in R.S.

13:2590 for filings and services in civil matters."

Q    So 2590.1 also authorizes you and only you to decide the filing fee; is that correct?

A    Yes, uh-huh.

MS. ADAMS:

I'm going to suggest that we take a quick break, if that works for you guys.

MR. SMITH:

That's fine.

MS. ADAMS:

Okay, let's just take a five minute break and we'll see what else we can get through before lunch.  Does it sound good?

VIDEOGRAPHER:

We are off the record at 12:10 p.m.

(Off the record.)

VIDEOGRAPHER:

We are back on the record at 12:17 p.m.

BY MS. ADAMS:

Q    Judge Sanders, earlier you said that your court is a sole proprietorship according to the IRS?

A    Yes, we are what are called fee-based officials.

Q    So would you agree that your court is a

sole proprietorship?

A    No.

Q    But the IRS calls it a sole proprietorship?

A    For tax purposes, yes.

Q    So for tax purposes would you agree that your court is a sole proprietorship?

A    According to the IRS.  I'm not fighting the IRS, I'm not.  I'm not arguing with them.

Q    So what is a fee-based official?

A    You can google that and see what the IRS says.

Q    Well, what do you think it means?

A    It's somebody --

MS. STARKS:

    Objection.

BY MS. ADAMS:

Q    You can answer.

A    It's an official who is compensated for his time and energy based on fees, payment of fees.

Q    Is a sole proprietorship a type of business?

A    Per the IRS, I guess it is, sure.  In other words, they got to figure out a way to get us somehow, because if it was tax free, I don't think

Q    Would you describe your court as largely funded through fees?

A    Yes.

Q    Is it accurate to say that according to the IRS, your largest source of revenue is fees?

A    According to the IRS, no.  The IRS doesn't care where it comes from, they don't care if it comes from, I can do all marriages, I mean, it's all fees.  It's all fees, period.

Q    But you just said that you -- your court is a business according to the IRS, right?

A    For tax treatment purposes, yes.

Q    So for tax treatment purposes your court is a business?

A    I would say asked and answered, but yes, again.

Q    And money generated from operation of a business is revenue according to your definition, right?

A    It is.

Q    So then is it accurate to say that your court does have revenue?

A    No, it has fees.  I don't know why you want to stray away from the statutory language, I know you're trying to accomplish something and I

correct?

A    Yes.

Q    So the more people file in your court, the more money you get in your personal bank account, correct?

A    Yes.

Q    If landlords stopped filing evictions in your court and instead filed evictions in district court or city court, you would have less money in your personal account, right?

A    Yes.

Q    If that were to happen, how would the court's expenses get paid?

A    Expenses shrink and swell, depending on volume of cases filed.  If you go back all the way, if you take the trouble to go all the way back to 2001, which I think is the first year I ever did a legislative audit report, you can look at those expenses, they aren't anywhere what they are today.

Q    Why are your expenses higher today?

A    Because I opted to move into a bigger office when I was flooded out in '16, otherwise I would still be holding court in an 11X11 room and my rent is 350.  So you haven't -- well --

Q    So if landlords stopped filing evictions

operational expenses, but if I only have two cases a month and do this on my back porch, all I'm going to have is paper, pen, that's it.  So it just depends, just kind of fluctuate, I don't have any control over the number of cases filed, absolutely none.

Q    And if landlords started filing -- let me rephrase the question.  If landlords stopped filing evictions in your court, your compensation would be less too; is that correct?

A    The fees would be less, yes.

Q    And a portion of those fees end up being your compensation, right?

A    They are my fees.

Q    On the legislative auditor report, you have a number that is your compensation, right?

A    I can't remember if there's a line for that or if it says fees.  I don't know how I reflect it.

Q    That's all right, we'll come back to that when we look at the legislative audit reports after lunch.

A    They say what they say.

Q    You only get a Writ of Execution or Writ of Possession fee if you grant an eviction in favor

sure we're not mixing apples and oranges, cases filed do not equal judgments rendered.

Q   Okay.  So let me just go over that again.  So if a hundred cases are filed --

A   Okay.

Q   -- and in all of them you rule in favor of the tenant, you're not going to issue any Writs of Possession, correct?

MS. STARKS:

Asked and answered.  I think he said he wouldn't -- out of all of those hundred cases there wouldn't be a judgment in favor of the landlord, for all of those cases.

MS. ADAMS:

That's not my question.

BY MS. ADAMS:

Q   My question is -- what I'm trying to get at --

A   What I can say is, no Writ of Execution is ever issued unless a Writ of Judgment is issued.

Q   Right.  So the more --

A   I don't know what else to tell you.

Q   So let me go with your language then.  So the more judgments that are issued, the more possible Writs of Execution can be issued.

A    Yes.

Q    And the more judgments that are issued in favor of the landlord, the more fees your court may receive from Writs of Execution?

A    Yes, may.

Q    And in five percent of those cases, you will receive fees from Writs of Execution.

MR. SMITH:

Objection to form.  This is all based on speculation.  You've got the cases, you've got the documents, I just want to make it clear that you're using this hundred cases and five percent of those filings, this is all sort of a speculated estimate process that -- course of questioning that you're engaging.  So the objection is to form and speculation.

MS. ADAMS:

Okay.  Yeah, I will rephrase the question.

BY MS. ADAMS:

Q    You said that you don't issue a Writ of Possession unless you issue a judgment in favor of the landlord, right?

A    Yes.

Q    Therefore you don't receive a fee for a

Writ of Possession unless you issue a judgment in favor of the landlord, right?

A    Correct.  And most of the time we get a fee, as we discussed earlier we don't overly fret over it, sometimes we do not receive a fee, it's just not worth trying to chase it down.

Q    Is it accurate to say that about 90 percent of the filings in your court are for evections?

A    Yes.

Q    Does that mean about 90 percent of the filing fees received by your court are for evictions?

MR. SMITH:

Objection to form.  I don't know where those numbers are coming from.  Just foundation.

BY MS. ADAMS:

Q    Okay, let's go to another e-mail.

MS. ADAMS:

Just for the record I would like to point out the local rule 43 only allows one attorney to defend the witness in a deposition.  I assume the defending attorney is Ms. Starks?

MR. SMITH:

STEVEN SANDERS

Yes.

BY MS. ADAMS:

Q    Okay, let's turn to --

A    Still paragraph three, of which approximately 90 percent are evictions.

Q    Okay, so --

A    Again, just an approximation.

Q    Okay, great.  So let's talk again about Exhibit 6, bate stamp LG 00001251, same paragraph. In this e-mail to Ms. Joshi you estimated that 90 percent of the filings are evictions.  Did I read that correctly?

A    Sure, yes.

Q    Is that still your best estimate today?

A    Sure, yes.

Q    So my question is, if 90 percent of the cases filed in your court are evictions, does that translate to 90 percent of the fees you receive are for evictions?

A    Yes.  Of the fees of cases filed.  Again, you're not counting judgments of ownership, other ex officio notary stuff, weddings, effective September up until -- September 24 anyway, you're not -- when you say fees, it's collectively other stuff, other than just court cases.  But if you

A    No, no.

Q    So all of the notary services, affidavits, all of that, those other services that you discussed earlier, that all falls under miscellaneous, right?

A    Yes.

Q    Is the reason we don't see -- let me ask it this way.  Why don't we see a line item from the state?

A    Because that $100 flows through the parish.

Q    And it also shows up on a single W2?

A    Yes, yes, just one W2 I get.

Q    Okay, and the court fees here are listed as 753,739; is that right?

A    Yes.  Hopefully the math is right.  I think it was.

Q    And right before lunch you mentioned that about 90 percent of the fees you receive are from eviction filings.

A    Yes.

Q    So does that mean that about 90 percent of $753,739 you received in 2024 from court fees would be from eviction filings?

A    Yes.

Q    Now, assuming you didn't have any fees coming in from weddings, without court fees you wouldn't be able to afford that rent; is that right?

A    Yeah, I would do something different.

Q    You would have to maybe go back to your house, right?

A    Go to the house.  Go back to my in-laws' place of business, either way.

Q    And the --

A    Or, or, practice law, which is what I did the first seven or eight years I was JP, and I didn't even count any expense of the office towards JP because I was there as a lawyer.  So either way it goes, I'll figure something out one way or the other.  I would adjust accordingly.

Q    And the money for rent comes out of the in and out account too?

A    Uh-huh, yes, yes.

Q    What are the storage fees for?

A    Mini storage for all of those boxes of documents, which y'all looked at.

Q    How long do you keep records for?

A    Roughly ten years.  In fact, I got to get with the Secretary of State's office and see where

Donna Sanders, right?

A    Correct.

Q    So in 2024 she received one $145,539?

A    She did, yes.

Q    Does she get any additional compensation besides that amount?

A    No.

Q    And all of that amount comes from filing fees, correct?

A    Yes.

Q    And the majority of that amount probably comes from eviction filing fees, right?

A    Yes.  She does get some fee from a small claim but you already put it at roughly 90 percent, or whatever, so yes.

Q    So about 90 percent of her compensation comes from the eviction filing fees?

A    Yes.

Q    Okay.  Let's now turn to the 2023 report, I'm not going to go through all of the questions for each one but we'll do a little bit.  The 2023 report begins on bates label defendant 001837. Let's turn straight to the Statement of Revenues expenditures --

COURT REPORTER:

STEVEN SANDERS

was paid in 2023 was less than in 2024, right?

A    Correct.

Q    Okay.  And the total amount that the clerk, your wife Donna was paid in 2023 was less than in 2024, right?

A    Yes.

Q    And your compensation was also less in 2023 than in 2024, right?

A    Yes.

Q    So when you receive less money in court fees, everyone gets paid less; is that right?

A    Yes.

Q    Is it true that in 2023, like in 2024, the majority of your compensation came from eviction filing fees?

A    Yes.

Q    Okay, let's move on to 2022.  That begins, same exhibit, but that begins bate stamp -- bate stamp, defendant 001855, the Statement of Revenues, Expenditures and Changes in Fund Balance, For The Year Ending December 31, 2022.  Are you there?

A    Yes.

Q    What were the court fees you received in 2022?

compensation.

A    266,613.

Q    And is it accurate to say that the majority of that compensation came from eviction filing fees?

A    Yes.

Q    Would you say that 90 percent or more of that compensation came from eviction filing fees?

MS. STARKS:

Objection, speculative.

A    Yes. Because it's using the 90 percent number of evictions filed.

Q    And was that true in 2023 as well, about 90 percent of your Justice of the Peace compensation came from eviction filing fees?

MS. STARKS:

Same objection.

A    Yes.

Q    And also true for 2024?

MS. STARKS:

Same objection.

A    Yes.

Q    Has there ever been a time when evictions slowed down significantly in your court?

A    Yeah, during the moratorium back in '21,

STEVEN SANDERS

08/07/2025
Page 160

office, that's for sure.

Q    You mentioned you have a certain number of chairs in the, did you call it the reception room?

A    In the reception room there's two or three chairs for people who want to fill out a petition of eviction or a statement of claim. The room where we hold court, there's two, four, six, eight, ten chairs for litigants.

Q    How many evictions do you typically set for one day?

A    One day? There's no rhyme or reason. So generally speaking we set court every 15 minutes. We start at 9:00 in the morning, just because I've been doing this for so long, I can set four or five for 15 minutes, a big apartment complex like Reserve at White Oak, I might set ten for 15 minutes, because I know that even though they're filing on ten, they may only end up getting three judgments and only one person show up. So there's no rhyme or reason, it's not an exact science. During the middle of the month, toward the end things are busy, today, I'd be here anyway, but no court; yesterday I had court at 9 and 9:15; the day before that I had court at 9 and 9:15, but in about

Q    What does it depend on?

A    On the litigants, quite frankly.  Most of the time most people are there just to ask for more time to pay or move.  So there's not -- you know, occasionally obviously, obviously there's signs where a tenant, oh, well, we haven't been -- they had to get a repairman, okay, let's explore that, let's see what's going on.  But that's not the average case.  The average case is, I lost my job, can I have more days to pay, can I have more time to move.  That's the vast majority of the cases.

Q    Do you find that nonpayment of cases take less time to hear than cases for other lease violations?

A    Yes.

Q    Why is that?

A    Because there's not a lot of defense to nonpayment of rent.  There's some, but there's not a ton.

Q    Do some cases end up lasting only a few minutes?

A    Yes.

Q    Would you say the majority on the cases on a given day last for just a few minutes?

A    Yes.

Q    Your office, it's not a formal courthouse, correct?

A    No.  The parish has not deemed fit to build me one.

Q    Are there any signs outside directing people to the building or to your office?

A    Directing, there's a little sign by the front door that says Justice of the Peace.

Q    Do you wear a robe when you adjudicate cases?

A    No.  I've got a robe, started off wearing a robe 20 some odd years ago but it just seemed a little too pretentious.

Q    Where do you sit in the courtroom when you're adjudicating a case?

A    Behind a table.

Q    Do the litigants, where do they sit when their case is called?

A    From me to you.  I mean, five feet away, sometimes at the back, sometimes at the front. There's no rhyme or reason to it.

Q    When their case is called do they move up from where they're sitting or do they just stay where they're sitting?

A    Sometimes, it depends.  If they've

already sat down, if they come in, if they've already sat in the back, occasionally they'll move up front. If they're having hearing issues, if they're elderly, like I said, there is literally no rhyme or reason to that. Just what they want to do.

Q You said you sit behind a table. Can you describe the table?

MS. STARKS:

I'm going to object to this line of questioning, relevancy.

A It's a folding table, eight feet long. I want to say it's eight. Just a folding table. Costco table, plastic.

Q Have you ever had -- have you ever exceeded the capacity of the courtroom in terms of the number of people who have come to court?

A I don't have a capacity, that's one of the reasons I schedule stuff roughly every 15 minutes, to make sure that there's room for whoever wants to come because it is a quote/unquote "court of the people." I have people bring their children, they bring in there grandmother, they bring in their mother, they're bring in their father, you know, so have I ever had anybody

A    Sure.  Yes.

Q    And it's generally the same for everyone, right?

A    Yes, but in -- yes.  There's statute and then there's court practice, sure.

Q    Is your court practice different than what's required in the statute?

A    I don't think it is.

Q    Under what circumstances do you check the box or check the line rather next to, "It is further ordered that defendant pay all court costs"?

A    If I issue a judgment of eviction, in almost every case I'm going to order that the tenant pay the court cost.  And I can already know the next question, what instance would you not?

Q    And what instance would you not?

A    There's a handful of times in a given year where the landlord I think has acted a little bit too quickly, but the tenant has not paid the rent, so it's a little bit on both of them.  So once in a blue moon I'll split court cost, or if it's just the facts merited, it's just not even make them pay court cost, just get out, just leave, just go.  So it's not that often but it does pop

that's the best way to say it.

Q    When the constable executes a Writ of Possession what happens to all of the items that he lists as being found inside or on the premises?

MS. STARKS:

        Objection.

MS. ADAMS:

        On what basis?

MS. STARKS:

        He's not present.  He doesn't know.

A    Yeah, I couldn't tell you.

BY MS. ADAMS:

Q    Do you know?

A    They're put out.

Q    Do you know where?

A    No.

MS. STARKS:

        Same objection.

A    As I said, on a given rental property, rental premises, it could be at the curb by the street, it could be by a dumpster, it could be just by the front porch.  As I like to tell landlords, I am not in charge of that, that's the constable's job to do that, so I don't stick my nose in that.

Q    Have you ever been present when an

Q    Do you --

A    Anyway, I think that's what they are.

Q    Do you handle small claims cases by landlords seeking unpaid rent from tenants?

A    Yes.

Q    Are they sometimes the same landlords who also file evictions against those tenants?

A    Yes.

Q    So you just described the process of going through an eviction case in your court. That process you follow is in accordance with the Louisiana statutes that govern Justice of the Peace courts, right?

A    Yes.

Q    And you follow those laws in every case, right?

A    To the best of my ability.

Q    The procedure you described applies to everyone who comes through your court, right?

A    Yes.

Q    You treat all litigants the same?

A    Yes.

Q    Obviously a lot of landlords come to your court and you treat them all the same, right?

A    Yes.

Q    Nobody gets any kind of special treatment?

A    No.  One of the things you had asked about, well, could I charge less.  Yes, I mean, if I gave landlords a "volume discount," well then, you're going to point the figure at me and say well, look at that, you're favoring them, you charge them less money because they give you volume.  So, everybody is treated the same, every case is treated the same, they pay court cost it buys an opportunity "it buys to have a hearing." That's all it does.

Q    And tenants in your court are also treated the same, right?

A    Yes.

Q    Nobody gets special treatment?

A    No.

Q    And you follow the statutes in every case?

A    Yes, the best I can.

Q    Okay, let's talk specifically about Johnnie Rushing's case.

A    Okay.

Q    So we're going to go to -- we're going to go to --

Exhibit 13.)

BY MS. ADAMS:

Q    Judge Sanders, do you recognize this document?

A    Yes.

Q    Okay, what is this?

A    Petition of Eviction and Order 87,846. Dorothy Ann Chenier as plaintiff and Johnnie, J-o-h-n-n-i-e, Rushing, as defendant.

Q    And Johnnie Rushing is of course a plaintiff in this lawsuit; is that right?

A    Yes.

Q    The process by which this petition was filed was the same as in any other eviction case, right?

A    Yes.

Q    The same paperwork was filed as in any eviction case?

A    Yes.

Q    It was served the same way as in any other eviction case?

A    Yes.  I noted that I filled this one out, just randomly.

Q    So the only difference might be that some of the time, you said I think about 50 percent of

time you fill it and 50 percent of the time Donna fills it out, right?

A    It's more like 90 percent clerk, 10 percent me.

Q    So other than the fact that you were the one who filled out and signed in the court order portion of this form, the rest of the form is the same as in any other eviction case, right?

A    Yes.

Q    The landlord in this case was charged the same fees as in any other eviction case, right?

A    Yes.

Q    And this case proceeded on the same timeline as any other eviction case, right?

A    Yes.

Q    It was scheduled for hearing about a week out like in any other eviction case, right?

A    Yes.

Q    This landlord could have filed in district court; is that right?

A    Sure.

Q    Yes?

A    Yes.

Q    But he chose to file it in your case, right?

A     It's a lady, but yes.

Q     The hearing in this case never occurred; is that right?

A     That's correct.

Q     But the hearing was set for the same location as any other eviction case, right?

A     Yes.

Q     Okay.  And the same procedures were followed in any every aspect of filing and setting this eviction case, right?

A     Yes.

Q     And those were the procedures that were dictated by state law, right?

A     Yes.

Q     And in terms of the fee that the landlord filed to initiate this eviction case, that fee was allocated between your office, the constable's office and the clerk in the same way as in any other eviction case, right?

A     Yes.

Q     It was deposited into the JP account, right?

A     Yes.

Q     And at the end of the month it was disbursed between the three offices, right?

A    Yes.

Q    And your portion was deposited into the in and out account; is that right?

A    End of June, yes.

Q    And at that point it was available for your personal use, right?

A    Yes.

Q    Looking at this petition, what was the reason for eviction in this case?

A    According to the plaintiff landlord, nonpayment of rent and other.  See if I can read her handwriting.  Explain Other Violations: "Left a pot on stove, didn't," I think she meant to say turn, as opposed to tarn, "but tarn it off, she called me to go check stove was on and would have," I think she's saying burned, "building down.  Very negative, I had," this copy may be cut off, "been I have something been she says, "not," I guess "is true."  That's what that says is my best guess.

Q    So this eviction was filed for nonpayment of rent and another lease violation, right?

A    Yes.

Q    What percentage of eviction cases are filed in your court for nonpayment of rent?

A    Do I give it a guess or do I speculate?

Q     What's your best guess?

A     My best guess for nonpayment of rent, 95 percent.

Q     So then this case to be accepted, it was filed for nonpayment of rent, is typical of most eviction cases filed in your court; is that right?

A     Yes.

Q     Aside from the motion to recuse that was filed in this case, was Ms. Rushing's case typical of most petitions for eviction for nonpayment that proceed in your court?

A     Atypical in the sense of the other, the pot and this other whatever rigmarole going on between the landlord and tenant, but for a nonpayment goes, yes, standard.

Q     And the way that the case -- the procedure that was used to file the case, to handle the money, to set the case, to serve the order to appear, all of those things were typical of how cases proceed in your court?

A     Yes.

Q     You mentioned that your portion of the filing fee in this case was deposited in the in and out account at the end of June.  Did I remember that correctly?

A    Yes.

Q    Okay.  And at that point it was also usable for court expenses, right?

A    Yes.

Q    And that's true in any other case filed in your court, right?

A    Yes.

Q    Okay, let's talk about Ms. George's case. This is going to be Exhibit 14, it's bates labeled defendant 031178.

MS. JOSHI:

Fourteen, right?

MS. ADAMS:

Fourteen.

(The document referred to by counsel was marked and attached to the deposition as Exhibit 14.)

BY MS. ADAMS:

Q    Judge Sanders, do you recognize this document?

A    Yes.

Q    Okay, what is it?

A    Petition of Eviction by Bierman Commercial Properties, BCP, versus Latoria George. I believe this was the fourth time she had been

STEVEN SANDERS

08/07/2025

Page 231

Q    Is that common that you might see the same tenants again and again, every month?

A    Oh, yes.  Extremely common.

Q    How often would you say you see repeat tenants?

A    25 to 30 percent.  I mean, as you look through this paperwork, you can see the same names. They're almost like family some of them.

Q    And are they usually there for nonpayment?

A    They're always there for nonpayment.

Q    When tenants are assisted by counsel in your court, you mentioned earlier that it's frequently Southeast Louisiana Legal Services, right?

A    Yes.

Q    And you understand that Southeast Louisiana Legal Services is a free legal aid agency, right?

A    Yes.

Q    Do you ever see tenants hire private counsel to represent them?

A    Two times a year, three times a year. Very, very, very rarely.

Q    How often do tenants pay to file

pleadings in your court?

A    How often do --

Q    Tenants pay to file pleadings in your court.

A    Virtually never.  I mean, maybe twice a year somebody will file a formal answer.  Southeast Louisiana Services, in those years where they were coming frequently, half the time I may say, oh, by the way, file an answer if you want to preserve your right to appeal it's, you know, 20 bucks, 30 bucks, 30 bucks.  But other than that, I mean, over the years has there been a lawyer that's ever said, hey, I'm coming to represent tenant Jane, John Doe, where do I go, what do I do, I'm not familiar with JP court.  Okay, this is where you need to come. By the way, counselor, you know, I don't know how it's going to go, but you might want to file an answer just because.  I know you don't -- most people don't handle eviction matters, and I don't want to see a lawyer caught with their pants down as far as not filing an answer, stating affirmative defense and all of that good stuff.  But like I said, that's -- I haven't had a lawyer represent anybody other than Southeast Louisiana Legal Services in ages.

have the actual copies of the cases, so --

Q    And you just said that the numbers sort of fluctuate between, you said like 3500 to 4200. In your experience is it typically 3,000 or more a year?

A    Probably starting in 2002-ish or 3-ish, yes.

Q    Other than doing the math, based on your case numbers, is there any other way that you could determine the exact number of evictions you heard in any given year?

A    No, no.  It's just a mechanical count.

Q    Could you count the actual pleadings?

A    Yes, that's what I'm saying, that's what you should do is make a mechanical count.  You physically count them.

Q    Could you count your docket book entries?

A    Yeah, yeah, you could do that.  Either way.

Q    So is it accurate -- we talked about annual numbers, is it accurate to say that you hear about three to 400 evictions per month?

A    If three to 350, there might be a random year where it's four because that would be four times 12, 48.  I don't know if I've hit 5,000, but

three to 350 for sure.

Q You mentioned before that you -- that a lot of landlords walk away from court with a payment plan; is that right?

A Yes.

Q Okay. Can you describe the process of working with a landlord and tenant to negotiate a repayment plan?

A Yes. The line of questioning is, landlord, you're the plaintiff and you've alleged in your petition that you have a lease, a rent notice or not, notice given, pending, what do you say the balance is? $1500. Tenant, does that number, does that sound correct? Yes. Okay, well, are you trying to pay and stay, you know, are you trying -- do you have money coming in, do you want to stay there? Yes. Give me some feel for what you might be able to do. And it depends. There -- you know, if it's the 25th of the month, my observation is most landlords don't really want to drift into another month and so most landlords just want money, most of them most of the time. There are some landlords who, this is the 20th time they've filed on the tenant and they're just like, you know, I don't even want the money, we're just

cost?

    A    Yes.

    Q    So the payment plan that's negotiated will include court cost?

    A    Yes.

    Q    And that includes the filing fees?

    A    Yes.

    Q    Anything else?

    A    No.

    Q    Not a writ fee?

    A    No, there's no writ, right?  Once in a blue moon I'll catch a landlord, I say catch them, you know, we'll look at what it is they're saying, that's why I ask the tenant, does that sound right to you.  Because in today's modern world, most of them have access to a tenant portal, they can see online what they owe, they know what they owe.  Once in a blue moon they'll say their costs are 200, and I'm like, 200, you can pay 150, right?  It's not 200, it's 150.  Well, that's just what we charge and I'm like, no, you can't do that.  No, it's rent, court cost, I understand that's a hard dollar out of pocket.  You know, once I've had a little bit of push back over the years, well city court let's us do it.  And I'm like, well, I'm not

city court.  Or our lease says it, I'll say, well now we're getting a little more interesting, let's look -- you brought your lease let's look at, because I, you know, I'm used to, when I say court cost, I mean court cost, I don't mean the $50 that your corporation says you might want to tack on because of the trouble and headache of coming to court.  So we have to juggle those numbers sometimes but that's not very often, and the late fees, there's some -- some landlords who have a cap on their late fees and it stops, others will carry that late fee until every last dime is paid, you know.  It makes it simple if they just -- a lot of landlords will cut off their late fee exposure from the day they file the petition, they stop it right there.  That way it's an easy figure and they're not keep adding $10 a day or something like that.  So, but yes, it usually includes the court cost.

Q    Do tenants in these negotiations ever express to you that they're struggling financially?

A    Yes, yes, that's the whole point, I lost my job, I buried my grandmother, I broke up with my boyfriend, I broke up with my girlfriend, I broke my leg and couldn't work, my hours have been reduced, I had to pay my car note, I had to buy

school supplies for the child.  Here we are, that's what I'm fixing to start hearing for August.  You name it.  I mean, they're going to say something.

Q    Do you get the sense that a lot of these tenants who participate in these negotiations in your court are living paycheck to paycheck?

MS. STARKS:

Speculation, objection.

THE WITNESS:

It will be speculation.

A    Sometimes, yes; sometimes no.  Because sometimes they -- if they're living paycheck to paycheck they sure are driving a nice Cadillac or Mercedes Benz, so it's hard to say.  Like I said, people spend their money, they prioritize all sorts of stuff, they've got a cell phone, they're dressed very nicely.  You know, I wish I could get into their head but I can't.

Q    Judge Sanders, let's move on to talk briefly about some aspects of appeals that we haven't discussed yet.  Can you describe your understanding of the appeals process from your court?

A    Sure.  Somebody wants to appeal they can -- I'm pretty liberal, if they've come in and I

bucks, whatever, those are real unique and few and far in between.  I'm back to trying to figure out numbers for you.

Q    Let me ask it this way.  The first number in your e-mail is that three are dismissed for various factual procedural defenses, would you say that means a successful defense or exception?

A    No, because pro se tenants do not have any clue what an exception is.

Q    Would you say that's a successful defense?

A    So it is they didn't properly give a five day notice to vacate, that's normally the case for that kind of comment, or they didn't give a notice of termination properly, they're untimely in that.  It's usually a procedural notice kind of thing that crops up.

Q    So in this e-mail, three cases are dismissed because of something the tenant argued successfully, right?

A    It's usually me arguing it successfully, quite frankly.

Q    Sorry.

A    But either way, yes.

Q    And then you said that number is probably

closer to three to five; is that right?

A    Yes.

Q    So is your best estimate that of the hundred cases, 50 percent are dismissed but only three to five of the hundred cases for nonpayment are dismissed because of a successful defense argued by the tenant or by you on the tenant's behalf?

A    So to make your math halfway, we'll use five dismissed for various and sundry things; 45, we'll use four, so I can make my math better.  Four percent are dismissed for a variety of things. That leaves 92, that makes 6, I'm sorry.  So 48 and 48, 48 judgments are granted, 48 cases are dismissed, for either they paid, they've moved, they've done whatever.

Q    So that category of 48 dismissals is at the request of the landlord.

A    Yes.

Q    Okay.

MS. ADAMS:

        I would like to break for five minutes, but I think we're pretty much --

MR. SMITH:

        Yeah, let's take a break.