**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**LATORIA GEORGE and JOHNNIE RUSHING, on behalf of themselves and all others similarly situated**

**CIVIL ACTION**

**VERSUS**

**NO. 25-168-JWD-EWD**

**STEVEN E. SANDERS, in his official capacity as East Baton Rouge Parish Ward 3 District 2 Justice of the Peace**

**RULING AND ORDER**

This matter comes before the Court on the *Motion for Class Certification* (Doc. 39) ("*MCC*") filed by Plaintiff Johnnie Rushing ("Rushing" or "Plaintiff").[1] In response, Defendant Steven E. Sanders, in his official capacity as East Baton Rouge Parish Ward 3, District 2 Justice of the Peace ("Sanders" or "Defendant") filed a *Motion to Dismiss for Lack of Subject Matter Jurisdiction* (Doc. 53) ("*MTD*") along with a combined memorandum in support of the *MTD* and opposition to the *MCC* (Doc. 53-1). Plaintiff filed a response to the *MTD*, (Doc. 64), and a reply in support of the *MCC*, (Doc. 68), and Defendant filed a reply in support of the *MTD*, (Doc. 71). Oral argument is not necessary. (Doc. 73.) The Court has carefully considered the law, the facts in

[1] Originally, the other plaintiff in this case was Latoria George. (*See Class Action Compl.* ¶ 29, Doc. 1.) However, Plaintiffs' counsel moved to withdraw from representing George "because they have not been able to contact her and she has failed to communicate with counsel, despite several efforts to contact her and after speaking with her mother." (Doc. 59 at 1; *see also* Doc. 37-1 at 2.) That motion was granted by the Magistrate Judge after George was ordered to appear at a hearing but failed to do so. (Doc. 59 at 2–3.) Thereafter, the Magistrate Judge issued a separate order requiring George to show cause why her claims should not be dismissed for failure to follow court orders. (Doc. 61.) George again failed to appear or contact the Court to advise that she would not appear, and the Court and Plaintiff counsel's attempts to reach her were unsuccessful. (Doc. 69.) As a result, George's claims were dismissed without prejudice for failure to comply with the Court's orders and for failure to prosecute her case under Fed. R. Civ. P. 41(b). (Doc. 70.) Thus, Rushing is the only remaining plaintiff in this case, and the instant motion was filed on her behalf only. (Doc. 39 at 1 n.1.)

the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's *MTD* is denied, and Plaintiff's *MCC* is granted.

**Table of Contents**


I. Factual Background ..... 3
A. Fees, Finances, and Compensation for Defendant's Justice of the Peace Court ..... 3
B. Procedures in Defendant's Justice of the Peace Court ..... 8
C. Plaintiff Rushing's Case in Justice of the Peace Court ..... 10
D. Plaintiff's Claims and the Instant Motions ..... 13
II. MTD ..... 14
A. Rule 12(b)(1) Standard ..... 14
B. Standing ..... 15
1. Parties' Arguments ..... 15
2. Applicable Law Governing Standing ..... 18
3. Analysis ..... 21
C. Mootness ..... 35
1. Parties' Arguments ..... 35
2. Applicable Law Governing Mootness ..... 38
3. Analysis ..... 42
III. MCC ..... 44
A. Rule 23 Standard ..... 44
B. Numerosity ..... 46
1. Parties' Arguments ..... 46
2. Applicable Law ..... 46
3. Analysis ..... 47
C. Commonality ..... 48
1. Parties' Arguments ..... 48
2. Applicable Law ..... 49
3. Analysis ..... 53
D. Typicality ..... 54
1. Parties' Arguments ..... 54
2. Applicable Law ..... 56
3. Analysis ..... 59
E. Adequacy ..... 60

1. Parties' Arguments ... 60
2. Law and Applicable Law ... 62
F. Rule 23(b)(2) Certification ... 65
1. Parties' Arguments ... 65
2. Law and Analysis ... 66
G. Ascertainability and Overbreadth ... 68
1. Parties' Arguments ... 68
2. Law and Analysis ... 69
IV. Conclusion ... 71

## I. Factual Background

### A. Fees, Finances, and Compensation for Defendant's Justice of the Peace Court

Defendant Sanders is the elected Justice of the Peace for Ward 3, District 2 in East Baton Rouge Parish. *See* La. Rev. Stat. § 13:2581 (describing the election of justices of the peace); *see also* Annual Financial Statements [for] Year Ended December 31, 2023 ("AFS 2023"), Doc. 40-5 (reflecting Sanders as sole holder of this office). He also serves as "Agency Head or Chief Executive Officer." (AFS 2023, Doc. 40-5 at 7.)

Per the Louisiana Justice Court Training Manual, "justices of the peace must perform the duties of that office impartially and diligently. They must avoid the appearance of impropriety at all times." (Doc. 40-3 at 34.) Sanders sees his role as "[t]o adjudicate disputes." (Sanders Dep. 13, Doc. 40-1.)

But, as an executive, Sanders must retain 50% of the court costs collected "for compensation and operational expenses of the office and court." La. Rev. Stat. § 13:2590(B)(1). Further, he may also "demand and receive" up to $120 in an eviction suit with a single defendant and $60 per writ of execution, with more fees for both per additional defendant. *Id.* § 13:2590(A)(2), (3). Sanders acknowledged that, under the statute, he is the one who gets to demand

the filing fee, and the law further authorizes Sanders to decide the filing fee. (Sanders Dep. 94–96, Doc. 40-1.) *See also* La. Rev. Stat. § 2590.1(B) ("A justice of the peace in East Baton Rouge Parish and Jefferson Parish may demand and receive up to the following amounts in addition to or in lieu of the costs provided for in R.S. 13:2590 for filings and services in civil matters: . . .").

Further, the parish pays Sanders $300 per month to handle criminal matters, though he handles those "[r]arely ever. Like never." (Sanders Dep. 30, Doc. 40-1.) He also receives $100 per month from the state. (*Id.* at 32.) *See also* La. Rev. Stat. § 13:2591(A)(1) (stating that justices of the peace are paid an additional amount by the state equal to what is paid by the parish, but in no event in excess of $120, provided the funds are "available and appropriated by the legislature"). Sanders said that $400 is to use "however [he] see[s] fit." (Sanders Dep. 38, Doc. 40-1.) Sanders "decided a long time ago just to let it go into savings, the savings is in [his] name, [he] can transfer and monkey moon it around[,] transfer money around, that's a better way to say that. [He] just let[s] it go into savings." (*Id.* at 46–47.)

Sanders testified that his court is largely funded through fees. (*Id.* at 99.) About 90% of those filing fees come from eviction cases. (*Id.* at 112–13.) Sanders described himself as a "fee-based official[] . . . who is compensated for his time and energy based on fees, payment of fees." (*Id.* at 96–97.) Sanders offered the following testimony about how this fee structure worked:

> Q: So the more people file in your court, the more money you get in your personal bank account, correct?
> A: Yes.
> Q: If landlords stopped filing evictions in your court and instead filed evictions in district court or city court, you would have less money in your personal account, right?
> A: Yes.
>
> * * *
>
> Q: If landlords stopped filing evictions in your court, your compensation would be less too; is that correct?

A: The fees would be less, yes.
Q: And a portion of those fees end up being your compensation, right?
A: They are my fees.

* * *

Q: And the more judgments that are issued in favor of the landlord, the more fees your court may receive from Writs of Execution?
A: Yes, may. . . .
Q: Therefore you don't receive a fee for a Writ of Possession unless you issue a judgment in favor of the landlord, right?
A: Correct.

(*Id.* at 101, 103, 111–12.)

Plaintiff offered into evidence annual financial statements prepared for Defendant,[2] and these statements reflect Sanders' heavy dependence on fees:

| **Year** | **Revenue from LA Gov't Sources** | **Revenue from Court Fees** | **Total Revenue** | **% of Total Revenue from LA Gov't Sources** | **% of Total Revenue from Court Fees** |
|---|---|---|---|---|---|
| 2019 | $4,800 | $561,008 | $577,808 | 0.8% | **97.1%** |
| 2020 | $4,800 | $388,171 | $454,501 | 1.1% | **85.4%** |
| 2021 | $4,800 | $470,394 | $491,657 | 1.0% | **95.7%** |
| 2022 | $4,800 | $637,387 | $653,210 | 0.7% | **97.6%** |
| 2023 | $5,040 | $629,211 | $644,865 | 0.8% | **97.6%** |
| 2024 | $5,040 | $753,739 | $765,903 | 0.7% | **98.4%** |

Thus, Defendant's court earned between 95.7% and 98.4% of its revenue from court fees between 2019 and 2024, with the sole exception of 2020, which was 85.4% because the court received $47,000 in COVID Paycheck Protection Program ("PPP") proceeds. (*See supra* n.2; *see also* AFS 2020, Doc. 44-9 at 6.) The percentage of total revenue from Louisiana Government resources during these years did not exceed 1.1%. (*See supra* n.2.)

[2] *See* Annual Financial Statements [for] Year Ended December 31, 2024 ("AFS 2024"), Doc. 44-6 at 8; AFS 2023, Doc. 44-5 at 6; Annual Financial Statements [for] Year Ended December 31, 2022 ("AFS 2022"), Doc. 44-7 at 6; Complied Financial Statements as of and for the Year Ended December 31, 2021 ("AFS 2021"), Doc. 44-8 at 5; Annual Financial Statements [for] Year Ended December 31, 2020 ("AFS 2020"), Doc. 44-9 at 6; Annual Financial Statements [for] Year Ended December 31, 2019 ("AFS 2019"), Doc. 44-10 at 6.

Additionally, under Louisiana law, "[a] justice of the peace in . . . East Baton Rouge Parish may appoint a clerk of court whose jurisdiction shall coincide with the jurisdiction of the appointing justice of the peace." La. Rev. Stat. § 13:2590.1(A)(1). "The clerk of court shall have authority to accept, record, and process filings." *Id.* § 13:2590.1(A)(2). Sanders hired his wife as his clerk, and she works part-time from roughly 9:00 a.m. to 1:00 p.m., Monday through Friday, with a little before and after. (Sanders Dep. 41–42, Doc. 40-1.) Sander's wife is paid through fees, (*id.* at 42), and, in 2024, she received compensation in the amount of $145,539, (*id.* at 144).

Again, Sanders admitted that, for many years like 2023 and 2024, about 90% of his fees came from evictions. (*See* Sanders Dep. 112–13, 123, 146, Doc. 40-1.) Court starts at 9:00 a.m. (*Id.* at 160.) Generally, Sanders sets court every fifteen minutes, but he can do anywhere from four or five to ten in a fifteen-minute period, and a majority of his cases take just a few minutes. (*Id.* at 160, 162.) In almost every case, if Sanders issues a judgment of eviction, he orders the tenant to pay court costs. (*Id.* at 185.) Tenants "very, very, very rarely" hire private counsel to represent them ("two[,] . . . three times a year"), and they "[v]irtually never" file pleadings ("maybe twice a year somebody will file a formal answer"). (*Id.* at 231–32.) Sanders testified:

> Q: Do tenants in these negotiations ever express to you that they're struggling financially?
> A: Yes, yes, that's the whole point, I lost my job, I buried my grandmother, I broke up with my boyfriend, I broke up with my girlfriend, I broke my leg and couldn't work, my hours have been reduced, I had to pay my car note, I had to buy school supplies for the child.

(*Id.* at 241–42.)

Sanders estimated that, of 100 cases filed, four are dismissed "for various and sundry things," 48 judgments of possession are granted, and 48 cases are dismissed at the request of the

landlord. (*Id.* at 262.) That is, only three to five times out of a hundred is a case dismissed, usually because of something Sanders argued successfully on behalf of the tenant. (*Id.* at 261–62.)[3]

Sanders also testified about what he does with the fees. Again, under state law:

> Fifty percent of the court costs collected pursuant to Subsection A of this Section shall be retained by the justice of the peace for compensation and operational expenses of the office and court, and fifty percent of the court costs shall be used for compensation and operational expenses of the ward constable's office.

La. Rev. Stat. § 13:2590(B)(1). Fees from cases are deposited into an "in and out" account which are then usable for court expenses. (Sanders Dep. 223–24, Doc. 40-1; *see also id.* at 45 ("I have an in and out, a separate account . . . and that's what's used to pay the expenses and whatever.").) Sanders controls this account. (*Id.* at 45.) At the end of the month, Sanders allocates all the money in the Justice of the Peace accounts between that, the clerk of court account, and the in and out account. (*Id.* at 44–46, 221–22.) He admitted that the "in and out/attorney account function[s] essentially as a personal checking account." (*Id.* at 55.) He testified: "The in and out account is . . . my personal money at that point. . . . I do with it whatever." (*Id.* at 56.) He can use that money to

[3] In a separate email, dated July 1, 2023 (before Sanders's deposition), Sanders described the numbers somewhat differently:

> I'd sat [sic] more like 95 out of 100 cases are for non-payment. Besides procedural defenses (failure to give 5 day notice for instance,) there isn't a lot of defense to non-payment of rent. As you listened in court, we try to work some kind of payment plan where possible. Occasionally there will be some set-off for failure to make repairs, or some other odd fact pattern. However, this is my "guesstimate" on 100 cases -- 3 are dismissed for various factual/procedural defenses. 25 are dismissed because the tenant pays before the hearing. Another 30 are granted in favor of the plaintiff but with a payment plan. Another 5 are granted where the tenant appears in court but just doesn't have the means to even make a payment plan. Then the remaining cases he (about 47) [sic] are straight up defaults because the tenant did not show up to court. Of those final cases, many end up paying and staying after the judgment is granted. The best estimate of tenants who are ultimately evicted lies in the Constable's Returns for the Writs of Possession, but even that is an estimate. Some tenants leave on their own before the hearing, others after the hearing and turn in keys, etc.

(Email from Sanders to Anjana Joshi of SPLC, Doc. 41-7 at 2.) These differences are not material for present purposes.

pay for "pens and papers for [the] court[,] . . . rent for [the] court[,] . . . personal expenses[,] . . . [or] a vacation[.]" (*Id.* at 58–59.) If he wanted, he could "not renew [his] lease and hold . . . court out of [his] house," so he "wouldn't have to pay rent anymore" and have "more money in [his] in and out/attorney account to use for whatever expenses [he] want[s.]" (*Id.* at 59.)

For tax purposes, the justice of the peace is like all fee-based officials—a sole proprietorship. (*Id.* at 96, 99; *see also* AFS 2024, Doc. 44-6 at 5 (letter from CPA for financial statement listing Sanders as "Owner" and justice of the peace court as "a proprietorship").)

In 2024, Ward paid himself compensation in the amount of $294,644. (AFS 2024, Doc. 44-6 at 8.) That amount did not materially change from 2019, when his pay was $233,598. (AFS 2019, Doc. 44-10 at 6.) In 2024, fees were also used to pay the court's operating expenses, including office expenses, professional fees, rent, storage, and telephones, among other expenses. (AFS 2024, Doc. 44-6 at 8.) Sanders acknowledged that, without fees, he would not be able to afford rent, and he might have to go back to his house. (Sanders Dep. 128, Doc. 40-1.)

**B. Procedures in Defendant's Justice of the Peace Court**

Sanders admitted that landlords with property on overlapping jurisdictions can choose to file in his court, Baton Rouge City Court, or the district court. (Sanders Dep. 22–23, Doc. 40-1.) The procedures in each court differ.

For example, in the justice of the peace court, "technical rules of evidence are relaxed, and all relevant evidence is admissible, including hearsay, provided the justice of the peace satisfies himself of its general reliability, and further provided that the judgment is founded upon competent evidence." La. Code Civ. Proc. art. 4921.2(B). (*See also* Sanders Dep. 25, Doc. 40-1 (confirming that the rules of evidence are relaxed, limited hearsay is allowed, and documents generally do not need to be formally introduced into the record).) The record is also limited. *See* La. Code Civ.

Proc. art. 4918.[4] Sanders testified that there is no formal courtroom; rather, Sanders sits behind an "eight [foot] long" "plastic" "folding table" from "Costco," wears no black robe, and lacks a court reporter. (Sanders Dep. 24, 163–64, Doc. 40-1.)

Moreover, justices of the peace do not have to be lawyers, while district judges and city court judges do. *Compare* La. Const. art. V, § 24(A)(2) ("A judge of the . . . district court . . . shall have been admitted to the practice of law in the state for at least . . . eight years"), *and* La. Rev. Stat. § 13:1873 ("Judges of city courts elected after the effective date of this Section [1960] shall be licensed to practice law in the State of Louisiana for at least five years previous to their election"), *with* La. Rev. Stat. § 13:2582 ("Each justice of the peace shall be of good moral character, a qualified elector, a resident of the ward and district from which elected, and able to read and write the English language correctly. . . [and] shall possess a high school diploma or its equivalent . . . ."). Sanders is a lawyer, but he only needs to receive roughly 12 hours of training from the Louisiana Attorney General's office every two years. (Sanders Dep. 10, 13–14, Doc. 40-1.) Of that training, there is a one to one and a half hour "discussion about evictions." (*Id.* at 13–14.) Sanders does not have Westlaw, LexisNexis, or other legal research platforms. (*Id.* at 14.)

Critically, the appeal rights differ as well. In district or city court, the plaintiff gets the usual right of first appeal to the Louisiana Courts of Appeal and then to the Louisiana Supreme Court. *See* La. Code Civ. Proc. art. 5001; La. Code Civ. Proc. art. 4735; La. Const. art. V, § 10; La. Const.

---

[4] Article 4918 specifically says:

> When no written pleadings are required, the justice of the peace or the clerk of court shall record in a permanent book or case file the title of the case, the docket number, the name and address of all parties, a brief statement of the nature and amount of the claim, the issuance and service of citation, the defenses pleaded, motions and other pleas made, the names of witnesses who testified, a list of the documents offered at the trial, the rendition of judgment, and any appeal therefrom.

La. Code Civ. Proc. art. 4918.

art. V, § 5(F). Conversely, Article 4924 provides the limited appeal rights for those in justice of the peace court:

> A. Appeal from a judgment rendered by a justice of the peace court or a clerk of court shall be taken to the parish court or, if there is no parish court, to the district court of the parish in which the justice of the peace court is situated.
>
> B. The case is tried de novo on appeal. However, a trial de novo, in the district court from the justice of the peace court, is not subject to the jurisdictional limit of the justice of the peace court.
>
> C. No further appeal from the judgment of the parish or district court is allowed.
>
> D. Supervisory jurisdiction of the proceedings in the parish or district court may be exercised by the court of appeal which otherwise would have had appellate jurisdiction.

La. Code Civ. Proc. art. 4924. Importantly, if a tenant lives within the jurisdiction of a justice of the peace court, his landlord has the power to choose what appellate rights and procedural protections a tenant will receive, whereas, if a tenant lives outside the jurisdiction of a justice of the peace court, the tenant will receive the usual, full appellate rights afforded to district and city courts.

### C. Plaintiff Rushing's Case in Justice of the Peace Court

Plaintiff Johnnie Rushing is a 53-year-old woman living in Baton Rouge. (Rushing Decl. ¶ 1, Doc. 28.) She rented a unit there since September 2023. (*Id.* ¶ 3.)

On June 13, 2025, she received a text message with a picture of a summons which was taped to her door and which required her to appear for an eviction in Defendant's justice of the peace court. (*Id.* ¶ 4.) The summons was dated June 12, 2025, and her court date was June 19, 2025. (*Id.*)

Plaintiff explains that she stopped working about seven or eight years ago because she was disabled. (*Id.* ¶ 8.) She has heart and lung issues (including COPD), diabetes, an auto-immune disease, and she was recently diagnosed with kidney cancer. (*Id.*) She frequently travels to medical appointments in Mississippi and Tennessee for her chronic health issues. (*Id.* ¶ 9.) Her sole income is $1,410 per month from social security, and her rent is $1,100 a month. (*Id.* ¶ 10.) Despite her problems, she has still managed to pay the rent each month, though sometimes it was late because she was out of town for medical appointments and because her landlord no longer accepts electronic payments and instead wants cash. (*Id.* ¶¶ 11, 12.)

Plaintiff had a number of issues with her apartment (including broken and leaking appliances, inoperative electrical outlets, and dirty conditions when she moved in), and her landlord told her she could just move. (*Id.* ¶¶ 13–16.) Plaintiff said that she offered a partial payment for June, but her landlord would not accept and just wanted Plaintiff gone. (*Id.* ¶ 16.)

Plaintiff wanted to argue at her eviction hearing that she should not be evicted because (1) her landlord would not accept her rent; (2) she was late on her rent because of her disabilities and because her landlord refused electronic payments; (3) she is entitled to a rent credit because of the repair expenses and out-of-pocket expenses she incurred; and (4) her lease violations do not rise to the level of eviction. (*Id.* ¶¶ 17.)

However, Plaintiff was worried about losing because her landlord told her something like, "I can have you gone today, because I know someone who can get me the paperwork to make you leave the premises today." (*Id.* ¶ 18.) Her landlord also left her daughter a voicemail saying, "I am going to win," which made Plaintiff "feel like the system is set up to ensure that [she] [would] lose and that it [did] not matter what [she] explain[ed] about [her] situation in court to try to defend [herself]." (*Id.*) She also read that she could not change the decision if she was evicted and that she

could not get the decision reviewed by a court of appeal. (*Id.* ¶ 19.) Plaintiff did not want the eviction on her record because it would make it harder to find future housing. (*Id.* ¶ 20.)

Plaintiff testified:

> I read about the lawsuit and decided to participate in the lawsuit because I think it is unfair that Defendant Sanders funds his salary and court expenses with fees paid by my landlord. This, and my landlord's statements about her winning my eviction case, make me feel that I cannot get a fair trial. Everyone deserves fairness in court. l also think it is unfair that I cannot appeal my eviction by Justice of the Peace Sanders. I am concerned about the impact of these unfair laws on my own case, but also on other people who must appear in Justice of the Peace Sanders's court.

(*Id.* ¶ 21.) Plaintiff is "willing and able to represent a class of similarly situated people who are also or will be defendants in an eviction proceeding before Justice of the Peace Sanders" because she "want[s] to help other people who are in the same situation as [she was]." (*Id.* ¶ 22.)

Plaintiff filed her *First Amended Class Action Complaint* (Doc. 27) ("*FAC*") on June 17, 2025, and she then filed a motion to recuse Sanders from her eviction case, (Doc. 41-9). Rushing moved out of the unit on June 18, 2025. (Rushing Dep. 39–40, Doc. 41-10.) Her landlord dismissed the eviction matter before the date of the hearing. (*Id.* at 40.)

Nevertheless, Sanders acknowledged that the procedures in Plaintiff's case—e.g., the process by which Plaintiff's petition was filed, the location of the hearing, and the procedure used to handle the money, to set the case, and to serve the order to appear—were the same as in any other eviction case. (Sanders Dep. 219–21, 223, Doc. 40-1.) The landlord chose to file the eviction petition in Defendant's court rather than district court; the landlord was charged the same fees as in any other eviction case; and that fee was allocated between Sanders's office, the constable's office, and the clerk in the same way as in any other eviction case. (*Id.* at 220–21.) At the end of the month, Sander's portion was deposited into the in and out account, and it was available for his

personal use. (*Id.* at 221–22.) The same paperwork was filed as in any eviction case, and the petition for eviction was served the same way as in other eviction cases. (*Id.* at 219.) The case was on the same timeline as other eviction cases, and "the same procedures were followed in . . . every aspect of filing and setting this eviction case," with "those . . . procedures . . . dictated by state law." (*Id.* at 220–21.) This eviction was filed in part for nonpayment of rent, which Sanders estimated was like 95% of the eviction cases filed in his court. (*Id.* at 222–23.)

**D. Plaintiff's Claims and the Instant Motions**

Rushing asserts two claims. (*FAC* ¶¶ 232–55, Doc. 27.) First, Plaintiff claims that the statutory structure of the justice of the peace court and its fee system result in an inherent, institutional conflict of interest in violation of the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 232–45.) Second, Plaintiff claims that those tenants facing evictions in justice of the peace court are similarly situated to those facing the same in district court or city court, yet they receive fewer appellate rights in violation of the Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶¶ 246–55.) Rushing prays that this Court grant the following relief:

> b. Certify a class under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, represented by Plaintiffs;
>
> c. Issue a declaratory judgment that La. Rev. Stat. § 13:2590(A)(2)–(3) and § 13:2590(B)(1), as applied to Plaintiffs and the putative Class, create a financial conflict of interest that violates the Due Process Clause of the Fourteenth Amendment.
>
> d. Issue a declaratory judgment that La. Code Civ. Proc. art. 4924(C) violates the Equal Protection Clause of the Fourteenth Amendment by treating similarly situated tenants differently depending on whether a landlord elects to file a petition for eviction before a justice of the peace rather than another court with concurrent jurisdiction;

(*Id.* at 41.)

Rushing now moves to certify and represent a Class defined as the following: "All tenants who currently or will in the future be a defendant in an eviction proceeding before the Justice of the Peace for Ward 3, District 2 in East Baton Rouge Parish, Louisiana." (Doc. 39 at 1.)

Defendant responds by attacking jurisdiction and by opposing certification. (Doc. 53.) The heart of Defendant's argument is that Plaintiff's claims fail (along with certification) because Plaintiff voluntarily abandoned the premises before Sanders completed the eviction proceeding, thus denying her standing, rendering her case moot, and causing her case to be substantially different than the other putative class members'. (*See id.* and Doc. 53-1.)

## II. MTD

### A. Rule 12(b)(1) Standard

In a Rule 12(b)(1) motion, a party may raise the defense of lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But, "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his

claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010; *see also Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss.* with approval).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial" attacks and "factual" attacks. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523. Whereas, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

## B. Standing

### *1. Parties' Arguments*

#### a. Defendant's MTD Memorandum (Doc. 53-1)

Defendant argues that "Rushing's alleged injury is speculative at best." (Doc. 53-1 at 13.) According to Defendant, Rushing vacated the property before her eviction resulted in adverse consequences; the landlord dismissed the petition, and "[s]he was never ordered to vacate by court judgment, never assessed court costs or fees, and never subjected to any enforcement order or writ of possession." (*Id.*)

Further, even if Plaintiff suffered an injury, that injury is not fairly traceable to Defendant's conduct and cannot be redressed by the Court. (*Id.*) Again, Plaintiff ended her eviction proceeding through voluntary dismissal, and Sanders did not take any action or apply any challenged legal provision. (*Id.*) Again, there was no judgment of eviction or court costs assessed against her. (*Id.* at 13–14.) Likewise, she lacks appeal rights from her own conduct, not from the challenged statute. (*Id.*)

b. Plaintiff's MTD Opposition (Doc. 64)

Plaintiff responds:

> Rushing has standing to bring her claims because, at the time she filed her Amended Complaint, she faced the possibility of being evicted from her home under state statutes that allow Defendant Sanders to financially benefit every time an eviction case is filed before him and not another court with concurrent jurisdiction and to further benefit when he decides in favor of a landlord. She also faced the possibility of eviction under a state law that affords every tenant before Defendant Sanders fewer appellate rights than similarly situated tenants facing eviction before a city or district court judge with concurrent jurisdiction.

(Doc. 64 at 17–18.)

As to injury, Plaintiff cites authority that, for due process claims involving judicial decisionmakers with financial interests, the very act of submitting to the process constitutes injury, even though the party loses nothing until the end of the proceeding. (*Id.* at 18–19 (citing *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) (citing *Gibson*

*v. Berryhill*, 411 U.S. 564, 571–72 (1973))).) Likewise, other courts have found an injury in such situations even without an adverse ruling. (*Id.* at 19 (citing *J.F. v. Adams*, No. 21-11150, 2024 WL 1348524, at *4–5 (S.D.N.Y. Mar. 29, 2024); *Merck Sharp & Dohme Corp. v. Conway*, 861 F. Supp. 2d 802, 809 (E.D. Ky. 2012)).) Here, Plaintiff has established the inherent conflict of interest in the structure of Defendant's court and in every eviction case before it. (*Id.* at 19–20.) The Fifth Circuit recognized that this structural conflict of interest violates due process in *Brown v. Vance*, 637 F.2d 272 (5th Cir. 1981). (Doc. 64 at 20.)

Likewise, Plaintiff suffered an injury for her equal protection claim:

> [A]t the time she filed her Amended Complaint, she faced eviction before a judge governed by a statutory scheme that affords fewer procedural protections to tenants facing eviction before a justice of the peace than similarly situated tenants facing eviction before a district or city court judge, and there is no rational basis for that distinction.

(*Id.* at 21.) Plaintiff cites *Lindsey v. Normet*, 405 U.S. 56, 59–60 (1972), as support for her position. (Doc. 64 at 21–22.)

Plaintiff also argues her "constitutional injuries are fairly traceable to the statutory structure that she challenges through her lawsuit." (*Id.* at 22.) As to due process, such injuries are linked to the structural conflict of interest inherent with a state law that allows Defendant to benefit financially for evictions filed in his court and for rendering judgments in favor of the landlord and issuing writs of possession. (*Id.*) As to equal protection, the statutes arbitrarily cause Plaintiff to have fewer protections on appeal than tenants appearing in other courts with concurrent jurisdiction. (*Id.*)

Finally, redressability is met; "the Fifth Circuit has found declaratory judgments to be appropriate to remedy substantially similar structural financial conflicts of interest." (*Id.* at 23 (citing *Brown*, 637 F.2d at 286; *Caliste v. Cantrell*, 937 F.3d 525, 527 (5th Cir. 2019)).)

c. Defendant's MTD Reply (Doc. 71)

In reply, Defendant reiterates his position. (Doc. 71 at 5.) Specifically, Plaintiff "never appeared before Defendant Sanders, never received an adverse ruling, never paid any fee, and was never subjected to the alleged unconstitutional procedures." (*Id.*) "Rather, she voluntarily chose to vacate her unit before any hearing occurred, filed this lawsuit on the day the hearing was scheduled, and then moved out the very next day, thereby eliminating the possibility of any future exposure to Defendant Sanders's court." (*Id.*) And because there is no named plaintiff with standing, the entire case must be dismissed. (*Id.*)

Further, Plaintiff's reliance on *Brown* and other cases is misplaced because those decisions "addressed merits determinations after jurisdiction was established and involved plaintiffs actively subjected to ongoing proceedings before fee-dependent judges." (*Id.* at 7.) Here, Plaintiff faced only "possible future exposure," which is insufficient under Fifth Circuit law. (*Id.* (citing *Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019)).)

> In fact, this plaintiff never had a claim. The issue in this action revolves around the imposition of costs, and this plaintiff was never exposed to costs. She moved out of the apartment from which she was subject to eviction before costs could be imposed. No claim ever arose with respect to Rushing. She cannot act as a representative for a class of persons who claim damages in the form of costs.

(*Id.* at 7–8.)

### *2. Applicable Law Governing Standing*

"A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1985–86 (2024) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)). A plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable

by a favorable ruling." *Id.* at 1986 (cleaned up). "These requirements help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [his or her] invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

"The plaintiff 'bears the burden of establishing standing as of the time [he or she] brought th[e] lawsuit and maintaining it thereafter.'" *Murthy*, 144 S. Ct. at 1986 (first alterations by this Court; second by *Murthy*) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The Plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted)). "Where . . . the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence." *Murthy*, 144 S. Ct. at 1986 (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks omitted)).

Additionally, "standing is not dispensed in gross." *Id.* at 1988 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Thus, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Id.*

"To establish Article III standing, an alleged 'injury in fact' must be 'concrete, particularized, and actual or imminent.'" *Consumer Data Indus. Ass'n v. Tex. ex rel. Paxton*, No.

21-51038, 2023 WL 4744918, at *4 (5th Cir. July 25, 2023) (per curiam) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

To establish traceability, a plaintiff must show "that there is 'a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court[.]'" *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). "Standing exists where the purported injury is connected to allegedly unlawful government conduct." *Id.* (citing *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 520 (5th Cir. 2014)). Further, "[c]ausation . . . isn't precluded where the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Inclusive Cmtys. Project, Inc. v. Dep't of Treas.*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett*, 520 U.S. at 169). "Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Id.* (quoting *Bennett*, 520 U.S. at 169).

"[T]o satisfy the third element of redressability[,] . . . the plaintiff must show that the requested relief, if provided, will likely redress the injury-in-fact." *Hancock Cnty.*, 487 F. App'x at 195 (citations omitted). "To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.'" *Reule*, 114 F.4th at 368 (quoting *Inclusive Cmtys.*, 946 F.3d at 655 (emphasis in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000))). But, Plaintiffs are "not required to show that their requested relief would *certainly* redress their injuries; rather, they [are] required to show that their requested relief would *likely* (or substantially likely) redress

their injuries." *Hancock Cnty.*, 487 F. App'x at 197 (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *Lujan*, 504 U.S. at 561). "Moreover, the proper focus of the redressability inquiry is not whether the relief is likely to be granted; rather, the focus is whether, assuming that the requested relief is granted, that relief will likely redress the plaintiffs' injuries." *Id.* (citing *Adar v. Smith*, 639 F.3d 146, 150 (5th Cir. 2011) (en banc); *Rogers v. Brockette*, 588 F.2d 1057, 1063 (5th Cir. 1979) ("There must be a substantial probability that, if the court affords the relief requested, the plaintiffs' legal injuries will be remedied.") (internal quotation marks and ellipses omitted)). Moreover, "[t]he relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Cmtys.*, 946 F.3d at 655 (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)). But, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).

***3. Analysis***

Having carefully considered the matter, the Court will deny Defendant's *MTD*. In sum, each requirement of standing has been demonstrated for each of Plaintiff's claims. The Court will address each in turn.

a. <u>Due Process</u>

First, *Brown v. Vance*, 637 F.2d 272 (5th Cir. 1981) (Wisdom, J.) demonstrates how Plaintiff has standing for her due process claim. *Brown* involved "consolidated class actions challeng[ing] the statutory fee system for compensating justice court judges (justices of the peace) in the State of Mississippi." *Id.* at 274. That system provided that (a) "judge received $6 for each criminal case docketed and affidavit signed, regardless of the disposition of the case[;]" (b) "[t]he judge received $8 in each civil case, contested or uncontested, payable by the losing party[;]" and

(c) "each judge received $8 in civil cases for proceedings involving levy of execution on judgments and attachment and garnishment proceedings." *Id.* at 275. The two classes involved (a) "[a]ll persons who on or after June 4, 1971, faced criminal charges, or in the future will face criminal charges" in these courts; and (b) "[a]ll persons who on or after April 2, 1972, were sued as defendants, or in the future will be sued as defendants in civil suits" in these courts. *Id.* at 274 n.3. In short, they claimed that the system was "unconstitutional, as applied, for lack of due process." *Id.* at 274.

Judge Wisdom began his analysis with the following:

> In considering the Mississippi fee system the relevant constitutional fact is that a judge's bread and butter depend on the number of cases filed in his court. Traditionally, justices of the peace who handle petty criminal cases and small claims are close to the general public and are an important, if not essential, element in any state's system of justice. And there must be many, many judges in Mississippi, as in any other state, pure in heart and resistant to the effect their actions may have on arresting officers and litigating creditors. Nonetheless, the temptation exists to take a biased view that will find favor in the minds of arresting officers and litigating creditors. This vice inheres in the fee system. It is a fatal constitutional flaw. Every accused person and every civil litigant is entitled to a trial in a system that is not only fair on its face but in practical operation is free of temptation to the trial judge to enhance his income by leaning in the direction of conviction in criminal cases and judgment for the plaintiff in civil cases. The temptation may not rise to the level to which Saint Anthony was exposed, but it exists for the average man as a judge dependent on a steady flow of filing fees for subsistence.

*Id.* at 276. The Fifth Circuit first found the criminal fee system unconstitutional:

> We need find no instance of actual judicial bias to hold the fee system constitutionally infirm. [*Tumey v. Ohio*, 273 U.S. 510 (1927), and *Ward v. Village of Monroeville*, 409 U.S. 57 (1972),] do not require proof of actual judicial prejudice or of a direct pecuniary interest in the outcome of particular cases. The test is whether a fee system presents a "possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused". [*Tumey*, 273 U.S. at 532; *Ward*,

> 409 U.S. at 60]. Because the possibility exists that judges in Hinds and DeSoto counties will compete for business by currying favor with arresting officers or taking biased actions to increase their caseload, we conclude that, under the fee system, a judge might minimize the burden of proof required to convict the defendant or might be less than diligent in protecting the defendant's constitutional rights. The fee system, therefore, does not satisfy the [*Tumey*-*Ward*] test and deprives criminal defendants of their due process right to a trial before an impartial tribunal.

*Id.* at 282.

The Fifth Circuit also found that the district court used the wrong standard in evaluating the constitutionality of the civil fee structure, noting that in *Tumey*, *Ward*, and *Gibson v. Berryhill*, 411 U.S. 564 (1973):

> [T]he Supreme Court was fully aware that a presumption of probity attached to adjudicators but it was concerned over the "possible temptation to the average man" of yielding to the expectation of personal gain by abandoning neutrality. "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness'".

*Brown*, 637 F.2d at 284 (citation omitted). Moreover, "[i]n *Tumey* and *Ward* the Supreme Court . . . was not as interested in the probity of an individual judge or perhaps even, of the great majority of judges[;]" instead, "[i]t was interested . . . in the inherent defect in the legislative framework arising from the vulnerability of the average man-as the system works in practice and as it appears to defendants and to the public." *Id.*

> The Court's inquiry there and our inquiry here is not whether a particular man has succumbed to temptation, but whether the economic realities make the design of the fee system vulnerable to a "possible temptation" to the "average man" as judge. Here we have no need to be solicitous of the honor of a particular judge; none has been questioned. Nor do concerns of judicial administration necessarily require a high evidentiary barrier. The [*Tumey*-*Ward*] test, in sum, is levelled at the system, not the individual judge. This is the reason it speaks of temptation to the average man. The "average man as judge" concept was made the heart of the test to

> introduce a humble Everyman, prey to the vicissitudes of life, the need for bread on the table, and for small favors from the right people.

*Id.* The Fifth Circuit also looked at the evidence to highlight the structural flaws in the system:

> The compensation the justice court judges in Mississippi derive from civil cases depends directly on the volume of cases filed. Creditors could choose, in any county in which suit is proper, which judge to decide their cases. It is reasonable to infer, and the record supports the inference, that creditors would file more frequently in the courts of the judges who tended to favor the plaintiffs.
>
> The evidence is undisputed that the civil cases are unevenly distributed throughout the judges in the various counties. . . . It does not follow, however, as the district court argued, that no due process violation can be demonstrated by an uneven case distribution-when the judge has a direct interest in larger total fees resulting from a larger volume of business. The system is indeed violative of due process.

*Id.* at 285. Judge Wisdom ultimately found:

> We conclude that the Mississippi civil justice court fee system presents a "possible temptation to the average man as judge", making it difficult, if not impossible, for judges to hold the balance "nice, clear and true" between plaintiff and defendant. Because the district court did not apply the [*Tumey-Ward*] standard and because substantial evidence does not support the district court's findings of fact, we hold that the fee system in civil cases in the State of Mississippi violates due process.

*Id.* at 286.

Finally, the Fifth Circuit affirmed the district court's finding that the Mississippi law was unconstitutional for "permitting an additional fee for further proceedings involving levy of execution on judgments and attachment and garnishment proceedings[.]" *Id.* Judge Wisdom quoted the district court in agreement:

> Thus, when a civil case is filed in a Justice Court and costs are prepaid, the Judge will receive his $8 fee no matter what the outcome of the case. However, if judgment is rendered for the plaintiff and execution levied or garnishment issued on the

> judgment, the Judge will receive an additional $8 fee. Even though from eighty to ninety-five per cent of the civil and criminal actions in Justice Court are uncontested, this fact creates a direct potential pecuniary interest for the Judge in the outcome of all civil cases filed in this court. . . . A Justice Court Judge, therefore, has an unconstitutional pecuniary interest in favoring plaintiffs who file civil suits in his court to this extent, and this portion of Mississippi's fee system cannot withstand the test of the [*Tumey*] rationale.

*Id.*

*Brown* easily shows why there is standing in this case. As in *Brown*, Plaintiff's injuries arise from the conflict of interest inherent in the structure of Defendant's court. "This vice inheres in the fee system. It is a fatal constitutional flaw." *Id.* at 276. Plaintiff was injured merely by being subject to it, regardless of the fact that it did not ultimately culminate in a judgment against her. That is precisely why the class in *Brown* was certified as people who "were sued as defendants, or in the future will be sued as defendants in civil suits" in those courts. *Id.* at 274 n.3. Plaintiff's injury is directly traceable to that "flaw[ed]" system, *id.* at 276, and a ruling finding the structure unconstitutional will redress those injuries.

*Caliste* further supports Plaintiff's position. There, the issue was whether the magistrate of the Orleans Parish Criminal District Court violated due process when he received "funding for various judicial expenses, most notably money to help pay for court reporters, judicial secretaries, and law clerks," based on "[t]he bail decisions the magistrate makes that determine whether a defendant obtains pretrial release." *Caliste*, 937 F.3d at 526. The appellate court found that "the 'average man as judge' standard applies and that significant nonmonetary benefits can create a conflict," explaining:

> Unlike the *Tumey* or *Brown* judges, Judge Cantrell does not receive a penny, either directly or indirectly, from his bail decisions. But requiring a secured money bond provides him with substantial nonmonetary benefits. Most significantly, money from commercial surety bond fees helps pay the judge's staff. Without support staff,

> a judge must spend more time performing administrative tasks. Time is money. And some important tasks cannot be done without staff. Judge Cantrell cannot simultaneously preside as judge and court reporter (he employs two). Office supplies also promote efficiency. The fees the Orleans Parish Criminal District Court receives from commercial sureties thus help fund critical pieces of a well-functioning chambers. And if an elected judge is unable to perform the duties of the job, the job may be at risk. So we do not think it makes much difference that the benefits Judge Cantrell and his colleagues receive from bail bonds are not monetary.

*Id.* at 530–31. The Fifth Circuit concluded:

> Because he must manage his chambers to perform the judicial tasks the voters elected him to do, Judge Cantrell has a direct and personal interest in the fiscal health of the public institution that benefits from the fees his court generates and that he also helps allocate. And the bond fees impact the bottom line of the court to a similar degree that the fines did in *Ward*, where they were 37–51% of the town's budget. *Ward*, 409 U.S. at 58 [ ]. The 20–25% of the Expense Fund that comes from bond fees is a bit below that percentage but still sizeable enough that it makes a meaningful difference in the staffing and supplies judges receive. The dual role thus may make the magistrate "partisan to maintain the high level of contribution" from the bond fees. *Ward*, 409 U.S. at 60[ ].
>
> * * *
>
> The temptation facing the Orleans Parish magistrate is far greater [than more typical court fee systems]. His dual role—the sole source of essential court funds and an appropriator of them—creates a direct, personal, and substantial interest in the outcome of decisions that would make the average judge vulnerable to the "temptation . . . not to hold the balance nice, clear, and true." *Tumey*, 273 U.S. at 532 [ ]. The current arrangement pushes beyond what due process allows. *Cf.* [*Cain v. White*, 937 F.3d 446, 453–54 (5th Cir. 2019)] (holding that Orleans Parish judges' role in both imposing and administering court fees and fines violated due process).

*Id.* at 531–32. The Fifth Circuit thus affirmed the district court's declaration: "Judge Cantrell's institutional incentives create a substantial and unconstitutional conflict of interest when he determines [the class's] ability to pay bail and sets the amount of that bail." *Id.* at 532–33.

*Caliste* also shows why Plaintiff has standing in this case. This Court provided extensive detail above about the ways in which Defendant's court fees are used to pay his court's operating expenses and the substantial salary of the Defendant's clerk—his wife. (*See* AFS 2019, Doc. 44-10 at 6; AFS 2024, Doc. 44-6 at 8; Sanders Dep. 128, 144, Doc. 40-1.) For the same reasons given by *Caliste*, the Court finds that there is standing for Plaintiff's claim that such "institutional incentives" cause a "substantial and unconstitutional conflict of interest" in violation of Plaintiff and the Class's right to due process. 937 F.3d at 532–533.

*United Church* reinforces this conclusion. There, the Seventh Circuit evaluated the constitutionality of a law under which (a) in the event of violations of restrictions on the use of property, a particular commission would conduct a hearing, and, (b) "'upon a finding by the Commission' of [a] violation, title [to the conveyance] shall revert to the Commission." *United Church*, 689 F.2d at 698. There was no provision to compensate divested owners of the value of improvements on the property, and all money obtained by the Commission from the sale of the property was paid to the State Treasury for deposit into the Commission's fund. *Id.* at 698–99.

The Seventh Circuit first rejected the district court's ruling that "the Church was required to exhaust its administrative remedies under state law—i.e., go through the Commission's reverter proceeding—before resorting to federal court under section 1983." *Id.* at 697. "[E]xhaustion of state administrative remedies is not a prerequisite to bringing an action under section 1983." *Id.* (citing *Patsy v. Bd. of Regents*, 102 S. Ct. 2557 (1982)).

The Seventh Circuit then found the law unconstitutional, explaining:

> We are persuaded that under this analysis the reverter hearing provisions of the Act are similarly unconstitutional, because they give the Commission a stake in the outcome of the hearing. As the Supreme Court remarked in *In re Murchison*, 349 U.S. 133, 136 [ ] (1955):

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness, of course, requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.
>
> In this case the Commission has a pecuniary interest in the outcome of the reverter proceedings, because if the Commission finds a nonuse or disuse, the property reverts to the Commission, without cost to the Commission even though the property has valuable improvements on it, and in the event of subsequent sale of the property, the proceeds redound to the coffers of the Commission. This is sufficient under the [*Gibson v. Berryhill*, 411 U.S. 564 (1973),] rule to mandate disqualification of the Commission in the reverter proceeding, and require that the reverter proceedings provisions of the statute be held unconstitutional.

*Id.* at 699. The Seventh Circuit also rejected the Commissioner's argument that they gained no personal benefit in the event of a reverter because "the disqualifying financial stake need not be 'direct or positive.' . . . '([T]he) principle of disqualification applies even if the pecuniary interest is only an indirect outgrowth of a public official's desire to protect official funds.'" *Id.* at 700 (second quote from *Meyer v. Niles Twp.*, 477 F. Supp. 357, 362 (N.D. Ill. 1979)).

The appellate court next looked at "the Church's failure to object to the reverter proceedings provisions of the statute at the time it took the property under the statute." *Id.* "It would have been futile to have attempted to raise a challenge to those provisions in the courts at that time: such 'assumed potential invasions,' of due process rights are simply not justiciable in the absence of a concrete case or controversy." *Id.* (citations omitted).

The Seventh Circuit also rejected the district court's conclusion that there was no immediate irreparable harm, explaining:

> We find the court abused its discretion in denying the preliminary injunction, first, because the legal basis of that denial was in error. As set forth above, we have concluded that requiring the Church to

> submit to the Commission's hearing procedures would deprive it of its right to due process under the Fourteenth Amendment. We also conclude the court abused its discretion in concluding that submission to the Commission's proceeding did not constitute sufficient injury to warrant preliminary relief.
>
> Submission to a fatally biased decisionmaking process is in itself a constitutional injury sufficient to warrant injunctive relief, where irreparable injury will follow in the due course of events, even though the party charged is to be deprived of nothing until the completion of the proceedings. *Gibson v. Berryhill*, 411 U.S. at 571-72, 574-75 [ ]. This is not a case like *Reichenberger v. Pritchard*, 660 F.2d 280 (7th Cir. 1981), where the plaintiffs alleged that a lawfully constituted decisionmaking body would at some future date deprive it of its rights at the unconstitutional behest of other parties. Rather the precise violation claimed here is the subjection to an unconstitutionally constituted decisionmaker. That injury has already occurred, and is therefore sufficiently "immediate" to warrant injunctive relief.

*Id.* at 701. For all these reasons, the Seventh Circuit reversed the district court's denial of injunctive relief. *Id.*

Like *Brown* and *Caliste*, *United Church* supports the conclusion that there is standing. As *United Church* recognized, "[s]ubmission to a fatally biased decisionmaking process is in itself a constitutional injury sufficient to warrant . . . relief, . . . even though the party charged is to be deprived of nothing until the completion of the proceedings." *Id*. That is to say, Plaintiff suffered a cognizable injury merely by being subject to Defendant's constitutionally deficient system, without the need for a decision to be rendered by Defendant or a judgment of possession issued. Again, that injury is fairly traceable to and caused by Defendant's conduct in administering the challenged system, and a judgment in Plaintiff's favor would redress the injury.

While *Brown* and *United Church* did not directly involve the issue of standing, other cases have applied similar reasoning to find such cases justiciable. For instance, in *J.F. v. Adams*, No. 21-11150, 2024 WL 1348524 (S.D.N.Y. Mar. 29, 2024), "six students with disabilities and their

parents" brought claims under, *inter alia*, the Individuals with Disabilities Education Act ("IDEA") alleging that the City of New York "denied them impartial due process hearings before an Impartial hearing officer ("IHO") pursuant to the IDEA." *Id.* at *1. The City had previously paid per diem IHOs and independent contractor IHOs to perform the hearings, but, in 2021, the City shifted to "house IHOs under OATH, an independent administrative law court" made up of "city employees." *Id.* Plaintiffs claimed these city employees were "conflicted as a matter of law and must recuse themselves from serving as IHOs." *Id.*

The district court found that the plaintiffs had standing. First, they suffered an injury in fact because:

> Plaintiffs have alleged a denial of an impartial tribunal for their IDEA claims because the City compensates OATH IHOs, and therefore the IHOs are biased. TAC at ¶¶ 164-69, 334. The very purpose of IDEA is to protect vulnerable children with disabilities and their right to a FAPE. Due process hearings before impartial adjudicators are critical. Because due process claims under the Constitution are historically analogous to due process claims under IDEA, Plaintiffs' procedural due process claims "constitute an injury sufficient to satisfy the standing requirement." *S.W. v. N.Y.C. Dep't of Educ*., 646 F. Supp. 2d 346, 358 (S.D.N.Y. 2009).

*Id.* at *5. The district court also rejected the argument that the plaintiff's injuries were speculative "because Plaintiffs have not been subject to an adverse decision of an OATH IHO, nor have [they] alleged an IHO's specific bias or partiality[.]" *Id.* The court explained:

> Plaintiffs seek system-wide declaratory and injunctive relief against the termination of "the system of independent IHOs" in an effort to prevent risk of future harm. . . . Because Plaintiffs allege that the due process hearing system is tainted by OATH's employment of IHOs, whether or not Plaintiffs have been subject to a negative decision by an OATH IHO, or can allege an IHO's specific bias, is irrelevant to their standing in this case.

*Id.* Lastly, Plaintiffs established traceability and redressability (1) because "Plaintiffs allege that due to the creation and implementation of the OATH Plan, Plaintiffs are deprived of due process

hearings by impartial *per diem* IHOs[;]" and (2) because "[e]njoining Defendants from implementing the OATH Plan would redress Plaintiffs' alleged injury." *Id.* at *6.

*J.F.* is directly in line with *Brown*, *Caliste*, and *United Church* and further demonstrates why there is standing in this case. As in *J.F.*, Plaintiff has "alleged a denial of an impartial tribunal for" evictions because of the way in which this justice of the peace is "compensate[d]," causing him to "therefore . . . [be] biased." *Id.* at *5. Further, Plaintiff's claim is not speculative; "[b]ecause Plaintiffs allege that the due process hearing system is tainted" by the justice of the peace's compensation, it is "irrelevant to [her] standing in this case . . . whether or not Plaintiff[ ] [has] been subject to a negative decision by [a] [justice of the peace], or can allege a[ ] [particular one's] specific bias." *Id.* Plaintiff's injuries are traceable to Defendant because she alleges that "due to the creation and implementation of the" fee system, she is "deprived of due process hearings by impartial" judges found in courts of concurrent jurisdiction. *Id.* at *6. Declaring the statutory scheme unconstitutional would remedy that.

Lastly, in *Merck Sharp & Dohme Corp. v. Conway*, 861 F. Supp. 2d 802 (E.D. Ky. 2012), plaintiff Merck sought injunctive relief on the grounds that the Kentucky Attorney General "violated its right to due process when he retained outside counsel on a contingency fee basis to aid in the prosecution of Merck under the Kentucky Consumer Protection Act ('KCPA')." *Id.* at 805–06. The Kentucky AG argued that Merck lacked ripeness and standing, but the district court rejected these arguments. *Id.* at 808–09. The AG first asserted that the claims were not ripe "because 'any final legal outcome is too remote to serve as the basis for a judicial review,'" *id.* at 808, but the district court responded:

> The AG mistakenly assumes that Merck objects to the possibility that there will be a judgment against it. . . . However, that is not the issue presented. Merck asserts claims for "constitutional rights [that] are being violated now," not at some point in the future. . . . The

> harm it seeks to address is the constitutional violation inherent in being required to defend itself in a biased proceeding. *See Esso Standard Oil Co. v. Mujica Cotto*, 389 F.3d 212, 221 n. 10 (1st Cir.2004) (noting that a biased proceeding "may inflict a constitutional injury independent of [its] outcome"). If the contingency fee arrangement between the AG and outside counsel violates Merck's due process rights, it does so regardless of the ultimate outcome of the litigation. Therefore, the AG's argument concerning ripeness is unpersuasive.

*Id.* at 809. Merck also had standing because:

> Merck has alleged a violation of its due process rights stemming from the use of contingency fee attorneys in the lawsuit against it. Accepting the allegations in the Complaint as true, Merck has suffered an injury in fact; namely, that it is being forced to "defend itself in an inherently biased quasi-criminal enforcement proceeding." [Record No. 20, p. 9] This is sufficient to constitute a concrete and ongoing injury in fact. *Cf. Esso Standard Oil*, 389 F.3d at 221 (finding an ongoing injury where plaintiff was engaged in administrative proceedings before a biased adjudicator). Moreover, there is a causal connection between the injury and the conduct complained of, because the alleged bias flows from the use of contingency fees to compensate the attorneys prosecuting the action. Finally, a favorable decision would result in the AG being enjoined from using contingency fee attorneys in prosecuting the case against Merck and, therefore, the injury would be redressed. Merck clearly has standing.

*Id.*

As in *Brown*, *Caliste*, and *United Church*, Plaintiff here is alleging that she was "forced to defend [herself[ in an inherently biased . . . proceeding. This is sufficient to constitute a concrete . . . injury[.]" *Id.* (cleaned up). Moreover, "there is a causal connection between the injury and the conduct complained of, because the alleged bias flows from" Defendant's defective compensation based on the number of cases and writs of attachment entered. *Id.* A favorable decision would result in Defendant being barred from such compensation, so, "the injury would be redressed." *Id.*

For all these reasons, and based on all these authorities, the Court finds that Plaintiff has standing to pursue her due process claim. The *MTD* is denied on this issue.

b. Equal Protection

Plaintiff also has standing to pursue her equal protection claim. "Discriminatory treatment at the hands of the government is an injury 'long recognized as judicially cognizable.'" *Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 218 (5th Cir. 2008) (quoting *Heckler v. Mathews*, 465 U.S. 728, 738 (1984)). "And such injury is recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation." *Id.* (citing *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

*Lindsey v. Normet*, 405 U.S. 56 (1972), demonstrates Plaintiff's standing for this claim. There, plaintiffs had refused to pay rent, and the appellee landlord threatened legal action. *Id.* at 58–59. But, "before statutory eviction procedures were begun in the Oregon courts," the tenants "filed suit in federal district court under 42 U.S.C. s 1983 seeking a declaratory judgment that the Oregon Forcible Entry and Wrongful Detainer (hereinafter sometimes FED) Statute . . . was . . . unconstitutional on its face, and an injunction against its continued enforcement." *Id.* at 59–60.

The Supreme Court found that one of the provisions—specifically, the "double-bond prerequisite for appealing an FED action"—violated the tenants' right to equal protection. *Id.* at 74. Unlike the appellate procedure in other civil cases, a defendant who lost an FED action at the district court and appealed was required to provide, in addition to the ordinary bond, "an undertaking with two sureties for the payment of twice the rental value of the premises 'from the commencement of the action in which the judgment was rendered until final judgment in the action." *Id.* at 75–76. If the landlord won on appeal, he was "entitled to twice the rents accruing during the appeal without proof of actual damage in that amount." *Id.* at 76.

The Oregon Supreme Court justified the law as "intended to prevent frivolous appeals for the purpose of delay," but the U.S. Supreme Court rejected this position. *Id*. at 76–78. "When an appeal is afforded, however, it cannot be granted to some litigants and capriciously or arbitrarily denied to others without violating the Equal Protection Clause." *Id.* at 77 (citations omitted). The purported purposes of the law were unnecessary given the general appeal bond requirements. *Id.* at 77–78. Moreover, "[n]o other appellant is subject to automatic assessment of unproved damages[,]" and the High Court could "discern nothing in the special purposes of the FED statute or in the special characteristics of the landlord[-]tenant relationship to warrant this discrimination." *Id.* The state certainly had authority for "reasonable procedural provisions to safeguard litigated property" and "to discourage patently insubstantial appeals," but:

> the State has not sought to protect a damage award or property an appellee is right-fully entitled to because of a lower court judgment. Instead, it has automatically doubled the stakes when a tenant seeks to appeal an adverse judgment in an FED action. The discrimination against the poor, who could pay their rent pending an appeal but cannot post the double bond, is particularly obvious. For them, as a practical matter, appeal is foreclosed, no matter how meritorious their case may be. The nonindigent FED appellant also is confronted by a substantial barrier to appeal faced by no other civil litigant in Oregon. The discrimination against the class of FED appellants is arbitrary and irrational, and the double-bond requirement of ORS s 105.160 violates the Equal Protection Clause.

*Id.* at 78–79.

Like *Brown*, *Caliste*, and *United Church*, standing was not at issue in *Lindsey*, but the case demonstrates why Plaintiff's case is nonetheless justiciable. The *Lindsey* plaintiff challenged the law at issue "before statutory eviction procedures were begun in the Oregon courts," yet the U.S. Supreme Court still found the double-bond provision unconstitutional. *Id.* at 59. Ultimately, the "[d]iscriminatory treatment at the hands of the government [was] an injury . . . irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal

treatment under law or regulation." *Tex. Cable*, 265 F. App'x at 218. As highlighted by *Lindsey*, the discriminatory treatment is inherent in the constitutionally flawed system, and it is directly traceable to it. And a decision invalidating that system would redress the systematic flaws inherent in the challenged provisions.

For all these reasons, the Court finds that Plaintiff has standing for the equal protection claim. As a result, the *MTD* on this issue will be denied.

## C. Mootness

### *1. Parties' Arguments*

#### a. Defendant's MTD Memorandum (Doc. 53-1)

Defendant next argues that the case is moot and that the inherently transitory exception to mootness does not apply. (Doc. 53-1 at 14.) According to Defendant, "[f]or the named plaintiff to pursue an 'inherently transitory' (but otherwise moot) claim on behalf of a class, the Court require[s] only that other class members would suffer the same injury: in this case the constant existence of a class of persons suffering the deprivation is certain." (*Id.* (cleaned up).) Defendant identifies a number of factors that are relevant to this exception and then asserts that none apply. (*Id.* at 15.) Again, Plaintiff's eviction proceeding ended before a hearing was held or judgment was rendered, so "there was no ruling against her, no court costs or fines assessed, and no judgment from which to appeal. Her alleged injury, exposure to an allegedly biased tribunal or denial of appellate review, never materialized." (*Id.*) Ultimately:

> The challenged conduct here, Defendant Sanders['s] handling of eviction proceedings pursuant to Louisiana statute, is neither so short-lived that it evades review nor uncertain in duration. Indeed, eviction cases can be fully litigated and appealed (although Rushing's was not fully litigated or appealed due solely to her own actions). There is therefore no "constant group of people suffering the same deprivation" as required by [*Gerstein v. Pugh*, 420 U.S.

> 103, 110 n.11 (1975), and *Ward v. Hellerstedt*, 753 F. App'x 236, 242 (5th Cir. 2018)].

(*Id.* at 15–16.)

b. Plaintiff's Opposition (Doc. 64)

Plaintiff responds that the case became moot because of Defendant's conduct in recusing himself from her case, not from Plaintiff's conduct. (Doc. 64 at 23.) But, in any event, she satisfies the transitory exception "because it is unlikely that this Court could have ruled on her claims or any Class member's claims before they become moot." (*Id.*)

Plaintiff looks to the same factors as Defendant but maintains that she meets these requirements. (*Id.* at 24.) In sum, "tenants' claims expire in a short period of time and there exists a constant group of tenants suffering the same harm as Ms. Rushing alleged in her complaint." (*Id.*) Evictions are summary proceedings and typically last only one week from filing to judgment. (*Id.*) Courts have found claims to be inherently transitory even when they last for years, which is much longer than the one-week cases typically last before Judge Sanders. (*Id.* at 25.) Thus, it is unlikely the claim could resolve in federal court before the case becomes moot, particularly when, as here, class discovery alone lasted almost four months. (*Id.* (citation omitted).)

This exception also applies "because there exists a constant group of putative class members suffering the same constitutional injuries Ms. Rushing faced when she filed her class action complaint." (*Id.* at 26.) During his deposition, Defendant estimated that he hears between 300 to 350 eviction cases per month, and, according to discovery responses, he "presided over at least 100 eviction cases each month to date in 2025 alone." (*Id.*)

> All putative Class members are subject to the same statutory funding and appellate structure that Ms. Rushing alleges violates due process and equal protection. There is therefore a constant group of plaintiffs suffering the same harm as Ms. Rushing alleged in her complaint: being subjected to an eviction proceeding in a court where the judge

> has a financial conflict of interest and where the tenant has fewer appellate rights than tenants in the city or district court.

(*Id.*)

Defendant asserts that the case became moot when Plaintiff vacated the premises, but (a) in fact, the case became moot when Sanders recused himself, and (b) regardless, the Court should look to the claim of the Class as a whole. (*Id.* at 27.) "The reason why Ms. Rushing's individual claims are moot are irrelevant to whether the Class's claims are inherently transitory." (*Id.*)

> Moreover, Defendant cites no caselaw for the proposition that a claim is not inherently transitory if the plaintiff's own actions mooted a case. Indeed, the inherently transitory exception developed in the context of a case where plaintiff's own actions could contribute to a case becoming moot. *See, e.g.*, *Gerstein*, 420 U.S. at 111 n. 11 (finding claims to be inherently transitory even though plaintiff could moot own claims challenging pretrial detention through "a guilty plea" or posting bond); *see also Thorpe v. District of Columbia*, 916 F. Supp. 2d 65, 66–67 (D.D.C. 2013) (fact that named plaintiffs had "recently moved out" of nursing facilities did not moot claims challenging unnecessary institutionalization of people with disabilities); *Motley v. Taylor*, 2021 WL 2556152, at *9 (M.D. Ala. 2021) (in case challenging suspension of drivers licenses for unpaid traffic tickets, the named plaintiff's decision to voluntarily pay her ticket, which resulted in the reinstatement of her license, did not moot class claims).
>
> For these reasons, this Court should find that, while Ms. Rushing's claims are moot, she can continue to represent a class of individuals bringing transitory due process and equal protection claims challenging the procedures that govern eviction proceedings before Defendant Sanders.

(*Id.* at 27.)

c. Defendant's MTD Reply (Doc. 71)

Defendant replies:

> There must . . . be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class is certified by the District Court . . . The controversy may exist, however, between a named defendant and a member of the class

> represented by the named plaintiff, even though the claim of the named plaintiff has become moot.

(Doc. 71 at 5–6 (quoting *Sosna v. Iowa*, 419 U.S. 393, 402–03 (1975)).)

Defendant next argues that Plaintiff cannot satisfy this exception by arguing that the cases are "too brief to be fully litigated" because, in *Gerstein* and *Sosna*, the exception applied because "(1) the named plaintiff's claim [was] unavoidably short-lived, such that it [would] always expire before the court [could] reasonably rule on class certification, and (2) a class [had] been certified or was capable of prompt certification before the claim expired." (*Id.* at 6.) Here, neither requirement is met. (*Id.*) Plaintiff's claim became mooted when she "voluntarily removed herself from the very circumstances she now challenges," as she "already planned to vacate the premises before the date of her eviction hearing." (*Id.* (citing Rush Dep. 39–40, Doc. 44-15).) According to Defendant, "[t]hese actions confirm that at no point did any alleged injury materialize, much less expired due to Plaintiff's own choices, not due to the structure or speed of eviction proceedings." (*Id.*) Moreover, *Gerstein* is distinguishable because, here, Plaintiff's "alleged injury[ ] [of] facing eviction before a biased Justice of the Peace[ ] could have been fully litigated had she simply remained in the rental unit and allowed the eviction process to proceed." (*Id.* at 6–7)

### *2. Applicable Law Governing Mootness*

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" *Nursery Decals & More, Inc. v. Neat Print, Inc.*, No. 22-10065, 2023 WL 4884803, at *4 (5th Cir. Aug. 1, 2023) (per curiam) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013)). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Id.* (quoting *Already*, 568 U.S. at 91).

"As a general rule, 'a purported class action becomes moot when the personal claims of all named plaintiffs' have been satisfied prior to certification of a class, since, under such circumstances, there is no longer an Article III 'case or controversy' for the court to resolve." *Ward v. Hellerstedt*, 753 F. App'x 236, 241 (5th Cir. 2018) (per curiam) (citing *Murray v. Fid. Nat'l Fin., Inc.*, 594 F.3d 419, 421 (5th Cir. 2010) (internal citations omitted)). But, "[p]otential class actions involving claims that are 'inherently transitory' fall within an exception to the general mootness rule, since such claims would otherwise likely evade review." *Id.* (quoting *Genesis Healthcare v. Symczyk*, 569 U.S. 66, 76 (2013)). "Indeed, in these cases it is likely that 'the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Id.* (quoting *Genesis Healthcare*, 569 U.S. at 76 (internal quotation marks and citations omitted)). "Therefore, in cases involving such claims, a class certification order is deemed to relate back to the time of the filing of the original complaint." *Id.* (citations omitted). *See also* 15 MOORE'S FEDERAL PRACTICE – CIVIL § 101.94 (2026) (describing "inherently transitory" exception in substantially the same way).

> While neither the Supreme Court nor this court has provided detailed guidance as to what makes a claim "inherently transitory," Supreme Court jurisprudence suggests that the following factors are pertinent to such a determination: the challenged conduct giving rise to the claim is of a fleeting or temporary nature; uncertainty exists at the outset as to the duration of each plaintiff's exposure to the allegedly harmful conduct; it is unlikely that any given individual plaintiff could see his claim to fruition prior to the claim becoming moot; and there exists a constant group of people suffering the harm alleged by the plaintiffs. *See, e.g.*, *Genesis Healthcare*, 569 U.S. at 76 [ ]; *Gerstein v. Pugh*, 420 U.S. 103, 110, n.11 [ ] (1975).

*Ward*, 753 F. App'x at 242.

Thus, for instance, in *Ward*, plaintiffs filed suit against the Commissioner of the Texas Department of State Health Services alleging overdetention following orders for inpatient

competency restoration and orders for evaluation and treatment following not guilty by reason of insanity acquittals. *Id.* at 239. After moving for class certification, the defendant filed a notice arguing that the plaintiffs' claims were moot because each had been admitted to state hospitals and thus, because no class had been certified, the class claims were moot. *Id.* at 239–40. Plaintiffs urged the "inherently transitory" exception to save the claims from mootness. *Id*. at 240. The district court certified two classes, though it ordered the plaintiff to file another amended complaint that included named plaintiffs to serve as class representatives. *Id.* at 240. Defendant appealed, arguing in part that the case was moot before the classes were certified. *Id.* at 240–41.

The Fifth Circuit found that the inherent transitory exception was met. *Id.* at 242–43. First, the named plaintiff's claims of unlawful detention were "of a fleeting or temporary nature, lasting anywhere from days to months," and there was "uncertainty" at the beginning of each named plaintiff's claim about "how long he or she will remain detained in a county jail prior to being transferred to a state hospital." *Id.* at 242. "Thus, although there are potential class members whose claims would not expire within the time it would take to obtain a class certification order, there is no way for Plaintiffs to ensure that any named plaintiff added to their complaint will be that individual." *Id.* at 242–43. Moreover, "even if an individual plaintiff were to maintain a live claim at the time of class certification, it is highly unlikely that such plaintiff's claims would remain live throughout the entirety of this lawsuit." *Id.* at 243. "Finally, regardless of the status of any individual named plaintiff's claim, there exists a constant group of people being subjected to Defendant's 'first-come, first-served' policy complained of by Plaintiffs. Indeed, by way of analogy, such policy operates similarly to a revolving door." *Id.* Thus, "the expiration of all of Plaintiffs' claims prior to the district court entering its class certification order did not have the effect of mooting this action as a whole," any future "certification order" by the district court

"would relate back to the filing of Plaintiffs' complaint." *Id.* (citing *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991)).

"[O]ther circuits recognize that the mootness exception for class-action claims can apply even where there is no pending motion for certification." *Patton v. Fitzhugh*, 131 F.4th 383, 397 (6th Cir.), *cert. denied*, 146 S. Ct. 821 (2025) (citing, *inter alia*, *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1249 (10th Cir. 2011); *Richardson v. Bledsoe*, 829 F.3d 273, 283–86 (3d Cir. 2016); *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090–92 (9th Cir. 2011)). Under this "well-reasoned position of our sibling circuits[,] . . . the filing of a class-action complaint can serve as the prerequisite for arguing the 'inherently transitory' exception for class-action claims." *Id.* at 398.

Moreover, "[t]he critical question with respect to the inherently transitory exception is whether the court will have time to rule on a class certification motion brought by a plaintiff who has standing to bring a particular claim before the claim will become moot." MOORE'S, *supra*, at § 101.94. "It does not matter *why* the claim will become moot. A plaintiff is not required to forego remedies to which the plaintiff is entitled in order to prevent a claim from becoming moot." *Id.* (citing *Salazar v. King*, 822 F.3d 61, 74–75 (2d Cir. 2016) (student debtor was not required to manufacture non-moot claim by delaying application for discharge to which debtor was entitled)). *See also Gerstein*, 420 U.S. at 111 n.11 (finding, where plaintiffs filed a class action claiming that those charged under a prosecutor's information have a constitutional right to a judicial hearing on the issue of probable cause, that this exception applied even though pretrial detention "may be ended at any time by[,]" *inter alia*, "a guilty plea."); *see also Motley v. Taylor*, No. 19-478, 2021 WL 2556152, at *2–3, *9 (M.D. Ala. June 22, 2021) (finding, where plaintiff filed class action complaint challenging the suspension of driver's licenses for non-payment of traffic tickets, that

although "Ms. Motley's action became moot when the suspension of her Alabama driver's license was lifted upon payment of her traffic infraction fines and related court costs, . . . this putative class action falls within the inherently transitory exception to the mootness doctrine.").

### *3. Analysis*

Having carefully considered the matter, the Court will deny the *MTD* on this issue. In short, the inherently transitory exception to mootness applies.

The *Ward* factors weigh strongly in Plaintiff's favor here. Without question, the challenged conduct is of a "fleeting or temporary nature." *Ward*, 753 F. App'x at 242. Under Louisiana law, evictions are summary proceedings. *See, e.g.*, *Sizeler Real Est. Mgmt. Co. v. Fam. Dollar Stores of La., Inc.*, 2001-1974 (La. App. 4 Cir. 3/20/02), 814 So. 2d 611, 614. "Summary proceedings are those which are conducted with rapidity, within the delays allowed by the court, and without citation and the observance of all the formalities required in ordinary proceedings." La. Code Civ. Proc. art. 2591. For evictions, "[t]he court shall make the [lessor's] rule returnable not earlier than the third day after service thereof, at which time the court shall try the rule and hear any defense which is made." *Id.* art. 4732(A). "If the court finds the lessor or owner entitled to the relief sought . . . the court shall render immediately a judgment of eviction ordering the lessee or occupant to deliver possession of the premises to the lessor or owner." *Id.* art. 4732(B). "If the lessee or occupant does not comply with the judgment of eviction within twenty-four hours after its rendition," the court must "immediately" issue a warrant to law enforcement to deliver possession. *Id.* art. 4733. Thus, if *Ward* found this factor weighed in favor of the exception when the unlawful detentions "last[ed] anywhere from days to months," 753 F. App'x at 242, then the same certainly applies here.

All of this also reinforces how the other factors support Plaintiff. To the extent there is no "uncertainty . . . at the outset as to the duration of each plaintiff's exposure to the allegedly harmful conduct," *id.*, that is only because these evictions proceedings are virtually guaranteed to be short and fleeting. Further, "[t]he critical question" for this exception "is whether the court will have time to rule on a class certification motion brought by a plaintiff who has standing to bring a particular claim before the claim will become moot." MOORE'S, *supra*, at § 101.94; *see also Ward*, 753 F. App'x at 241 (listing this as last factor). The Court is doubtful that Plaintiff could even file a meaningful motion for class certification in the time allowed for evictions,[5] and the Court is even more doubtful that it could issue a meaningful decision on the complicated issues in this case in that time, particularly in a case of this complexity and in a district with a docket this busy.

Finally, "there exists a constant group of people suffering the harm alleged by the plaintiffs." *Ward*, 753 F. App'x at 241. Sanders testified that, starting around 2002, there are typically 3,000 or more evictions a year, or at least 300–350 evictions per month. (Sanders Dep. 237–38, Doc. 44-1.) Sanders also admitted that, as of July 28, 2025, 100 or more eviction cases were filed in his court each month to date in 2025. (Doc. 44-11 at 10.) Thus, as Plaintiff argues, there is a constant stream of putative class members who suffer the same constitutional harm.

Defendant argues that the inherently transitory exception does not apply because Plaintiff was responsible for mooting her case. But, again, "[i]t does not matter *why* the claim will become moot." MOORE'S, *supra*, at § 101.94. And *Gerstein* and *Motley* exemplify why Defendant's position is not supported in the caselaw.

[5] In any event, any such motion would likely be a pro forma "placeholder," and "[f]orcing plaintiffs to file premature motions for class certification serves to strain judicial resources, tax a court's economy, and force litigants and counsel to engage in pretense." *Patton,* 131 F.4th at 399.

For all these reasons, the Court finds that "this putative class action falls within the inherently transitory exception to the mootness doctrine." *Motley*, 2021 WL 2556152, at *9. As a result, Defendant's *MTD* will be denied.

## III. MCC

### A. Rule 23 Standard

This Court has explained:

> Class action is the exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. [*Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (internal citation omitted).] The requirements for class certification are governed by Rule 23 of Federal Rules of Civil Procedure. To obtain class certification, parties must satisfy Rule 23(a)'s four prerequisites:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of that class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Assuming the proposed class satisfies the requirements of Rule 23(a), Plaintiffs must also establish the requirements of Rule 23(b)(1), (2), or (3). [*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).]

*Lewis v. Cain*, 324 F.R.D. 159, 166–67 (M.D. La. 2018) (Dick, J.). Here, Plaintiff "seek[s] class certification under Rule 23(b)(2), which permits certification if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.'" *Id.* at 167.

"The Fifth Circuit has also articulated an 'ascertainability' requirement for Rule 23 class actions." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933 (5th Cir. 2023) (citing *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23.")). "[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Id.* at 933 n.36 (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam)).

"Plaintiff[ ], as the party seeking class certification, bear[s] the burden of demonstrating that the requirements of Rule 23 have been met." *Lewis*, 324 F.R.D. at 167 (citing *Ibe*, 836 F.3d at 528 (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003))). "Rule 23 does not set forth a mere pleading standard." *Id.* (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

> It is well-established that "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class." [*Perry*, 675 F.3d at 837 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).] Generally, "a district court has broad discretion when deciding a motion for class certification." [*Dockery v. Fischer*, 253 F. Supp. 3d 832, 845 (S.D. Miss. 2015) (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998)).] Before concluding that a class has satisfied the requirements of Rule 23(a), an analysis will "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim." [*Wal–Mart*, 564 U.S. at 351.] The Fifth Circuit has traditionally construed this directive to require a district court to "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." [*Perry*, 675 F.3d at 837 (quoting *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2003) (internal quotations omitted)).]
>
> However, Rule 23 does not require Plaintiffs to show that questions common to the class "will be answered, on the merits, in favor of the class." [*Cole v. Livingston*, No. 14-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans*

> *& Trust Funds*, 568 U.S. 455, 459 (2013)).] "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." [*Amgen*, 568 U.S. at 466.]

*Lewis*, 324 F.R.D. at 167 (footnotes incorporated).

**B. Numerosity**

***1. Parties' Arguments***

Plaintiff first argues that the class is so numerous that joinder of all members is impracticable. (Doc. 39-1 at 27.) According to Plaintiff, a class of more than 40 members raises a presumption that this requirement is met. (*Id.*) Here, Sanders testified that he presides over 300 to 350 cases per month, or roughly 3,000 per year. (*Id.* at 27–28.) The Court should also look to other factors, including the poverty and other barriers of the class members and the fact that this is a civil rights suit. (*Id.* at 28 (citations omitted).) Those factors are met here, where, for instance, tenants rarely hire private counsel. (*Id.* at 29.)

Defendant does not address numerosity in his response. (*See* Doc. 53-1 at 16.) In reply, Plaintiff notes, "Defendant Sanders does not dispute that Ms. Rushing satisfies numerosity." (Doc. 68 at 6 n.2.)

***2. Applicable Law***

In *Lewis v. Cain*, Chief Judge Dick wrote:

> Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." The numerosity requirement "requires examination of the specific facts of each case and imposes no absolute limitations." [*Dockery*, 253 F. Supp. 3d at 846 (quoting *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 329 (1980)).] However, the Fifth Circuit has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable." [*Ibe*, 836 F.3d at 528 (quoting *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir.

> 2013)).] In addition, courts must consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." [*Dockery*, 253 F. Supp. 3d at 846 (quoting *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).] . . . In addition, the fluid nature of a plaintiff class, as in prison-litigation context, counsels in favor of certification of all present and future members. Although there is no strict threshold, classes containing more than 40 members are generally large enough to warrant certification. [*Braggs v. Dunn*, 321 F.R.D. 653, 663 (M.D. Ala. 2017).]

*Lewis*, 324 F.R.D. at 167–68 (footnotes incorporated).

***3. Analysis***

For many of the reasons given above, the requirements of numerosity are met here. Sanders testified that, starting around 2002, there are typically 3,000 or more evictions a year, or at least 300–350 evictions per month. (Sanders Dep. 237–38, Doc. 44-1.) Sanders also admitted that, as of July 28, 2025, 100 or more eviction cases were filed in his court each month to date in 2025. (Doc. 44-11 at 10–11.) Thus, "[a]lthough the number of members in a proposed class is not determinative of whether joinder is impracticable, . . . the size of the class in this case . . . is within the range that generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing, *inter alia*, 1 Newberg on Class Actions § 3.05, at 3–25 (3d ed.1992) (suggesting that any class consisting of more than 40 members "should raise a presumption that joinder is impracticable")).

Further, other relevant factors, such as the nature of the action and the size of each Plaintiff's claim, also weigh in favor of certification. *See Lewis*, 324 F.R.D. at 168. As explained above, the eviction proceedings are short and transitory and generally involve relatively small amounts.

"Finally, many of the proposed class members face severe financial hardship because of their conditions. These class members lack the financial resources necessary to bring suit individually in order to vindicate their rights." *Pitts v. Greenstein*, No. 10-635, 2011 WL 2193398, at *4 (M.D. La. June 6, 2011) (Brady, J.). Sanders testified:

> Q: Do tenants in these negotiations ever express to you that they're struggling financially?
> A: Yes, yes, that's the whole point, I lost my job, I buried my grandmother, I broke up with my boyfriend, I broke up with my girlfriend, I broke my leg and couldn't work, my hours have been reduced, I had to pay my car note, I had to buy school supplies for the child."

(Sanders Dep. 241–42, Doc. 44-1.)

Ultimately, Defendant has conceded that numerosity was satisfied by failing to oppose Plaintiff's motion on this issue. *See Payton v. Town of Maringouin*, No. 18-563, 2021 WL 2544416, at *26 (M.D. La. June 21, 2021) (deGravelles, J.) (collecting authorities on waiver). But, even if Defendant had not waived this issue, the Court would find, based on the above law and facts, that "the class is so numerous that joinder of all members is impracticable," and so the numerosity requirement is met.

### C. Commonality

#### *1. Parties' Arguments*

Plaintiff next argues that the commonality requirement is met. (Doc. 39-1 at 30.) Plaintiff emphasizes that her burden on this issue is not high, and civil rights cases often satisfy this burden easily. (*Id.* at 31.) Plaintiff lists these common questions of law and fact before asserting that resolving any of them "will serve as the 'glue' uniting the Class's factual and legal claims and will provide 'a common answer to the crucial question' of whether the statutory provisions challenged" in Counts I and II will "cause constitutional injuries to the Plaintiff and the putative Class

members." (*Id.* at 31–32.) Plaintiff also contends that this case is a "typical example of where commonality is satisfied—when a plaintiff challenges a statute or an entity's generally applicable policies." (*Id.* at 32–33 (citations omitted).) As Sanders stated, the procedures for eviction are mandated by state statutes and apply equally to anyone who comes through that court. (*Id.* at 33.)

Defendant responds that the key question is not whether there are common questions but whether there is a common answer "capable of class wide resolution." (Doc. 53-1 at 16 (quoting *Wal–Mart*, 564 U.S. at 350).) Here, "[t]enants' experiences differ drastically depending on landlord decisions, lease terms, defenses, and procedural history." (*Id.*) According to Defendant, such individualized issues preclude common answers. (*Id.* at 17.)

Plaintiff replies that this case involves a financial conflict-of-interest, so the key question is not what happens in individual cases but whether the system as a whole is improper. (Doc. 68 at 6.) Plaintiff returns to *Brown* to support her argument. (*Id.* at 6–7.) "Answering the common question of whether that funding and appellate structure violates due process and equal protection will serve as the 'glue' uniting the Class's claims and will 'drive the resolution of the litigation.'" (*Id.* at 7 (quoting *Wal–Mart*, 564 U.S. at 350, 352).) Plaintiff relies on *Cain v. City of New Orleans*, 327 F.R.D. 111, 125 (E.D. La. 2018); there, as here, Plaintiff's "'claims depend upon the common contention that the Judges' conflict of interest violates due process' and the court's appellate structure violates equal protection, 'a contention that is clearly capable of classwide resolution.'" (*Id.*)

***2. Applicable Law***

*Lewis v. Cain* again provides the appropriate standard:

> The Supreme Court, in *Wal–Mart Stores, Inc. v. Dukes*, further defined the contours of the "rigorous analysis" required by Rule 23. [*Perry*, 675 F.3d at 837 (citing *Wal–Mart*, 131 S. Ct. at 2551–52).] Under *Wal–Mart*, "[w]hat matters to class certification . . . is not the

> raising of common 'questions'—even in droves—but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." [131 S. Ct. at 2551 (citation omitted)].
>
> The *Wal–Mart* decision has heightened the standards for establishing commonality under Rule 23(a)(2) demanding more than the presentation of questions that are common to the class "because any competently crafted class complaint literally raises common questions." [131 S. Ct. at 2551 (citation omitted)]. Furthermore, members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant. [*Id.*] Thus, as evident in *Perry*, the commonality test requires more than establishing that there is "at least one issue whose resolution *will affect all or a significant number* of the putative class members." [675 F.3d at 840 (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)) (original emphasis) (internal quotation marks and citation omitted).]
>
> In order to satisfy commonality under *Wal–Mart*, the claims of every class member must "depend upon a common contention . . . that is capable of class wide resolution," meaning that the contention is "of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." [*Wal–Mart*, 131 S. Ct. at 2551.] Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." [*Id.* (quoting *Gen. Tel. Co. of SW. v. Falcon*, 457 U.S. 147, 157 (1982)).] Yet, the Fifth Circuit has clarified that "this contention need not relate specifically to the damages component of the class members' claims. Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'" [*Cole v. Livingston*, No. 14–1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016).]

*Lewis*, 324 F.R.D. at 168–69 (footnotes included).

For instance, in *Cain v. City of New Orleans*, plaintiffs filed a § 1983 suit "challenging the manner in which the Orleans Parish Criminal District Court ("OPCDC") collects post-judgment court debts from indigent criminal defendants" after they are sentenced. *Cain*, 327 F.R.D. at 115–16. Count Five "challenge[d] the Judges' practice of failing to inquire into ability to pay before

criminal defendants are imprisoned for nonpayment of court debts" and "the Judges' failure to provide a neutral tribunal to adjudicate ability to pay." *Id.* at 118. Count Six asserted an equal protection violation from "the Judges' policy of jailing and threatening to imprison criminal defendants for nonpayment of court debts," which plaintiffs claimed "impose[d] unduly harsh and punitive restrictions on debtors whose creditor is the State, as compared to debtors who owe money to private creditors." *Id.* "Plaintiffs' proposed class include[d] '[a]ll persons who currently owe or who will incur court debts arising from cases adjudicated in the [OPCDC]." *Id.*

Judge Vance began her analysis of commonality with the following:

> The Court has now resolved all issues of fact and law pertaining to the named plaintiffs' claims: the Court has granted summary judgment to plaintiffs on Count Five, and the remaining counts are dismissed. In granting summary judgment on Count Five, the Court held it undisputed that the Judges have a policy or practice of failing to conduct an ability-to-pay inquiry before plaintiffs are imprisoned for nonpayment of court debts. The Court also held it undisputed that the Judges' institutional incentives create a conflict of interest when they determine, or are supposed to determine, plaintiffs' ability to pay fines and fees.
>
> Regarding the first aspect of Count Five, all criminal defendants who owe court debts to OPCDC are at risk of suffering the same constitutional injury: imprisonment for failure to pay court debts without an ability-to-pay determination. *See Dukes*, 564 U.S. at 349-50 [ ]. Plaintiffs' claims "depend upon [the] common contention" that defendants' policy or practice is unconstitutional. *Id.* at 350 [ ]. Furthermore, this contention is "of such a nature that it is capable of classwide resolution": the Court's resolution of this aspect of Count Five turned on the constitutionality of the policy or practice, not on the specific facts of the named plaintiffs' experiences. *Id.*

*Id.* at 123.

*Cain* also rejected the defendants' argument about "differences between class members," as "these differences have no bearing on the common questions of fact and law that the Court has already decided." *Id.* (citing *Ibe*, 836 F.3d at 528 (noting that "[d]issimilarities among class

members should be considered to determine whether a common question is truly presented," but that "[e]ven a single common question of law or fact can suffice to establish commonality, so long as resolution of that question 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke'" (quoting *Wal–Mart*, 564 U.S. at 350))). The debts owed by individual class members varied, "[b]ut the challenged policy or practice relates to the Judges' collection, not imposition, of court debts. The Judges' collection practices create the same risk of injury regardless of when a criminal defendant's court debts were imposed or what types of court debts the individual currently owes." *Id.* Further, defendants argued that each putative class member would have to "receive an ability-to-pay inquiry," but "[a]ny such inquiry would be tainted by the unconstitutional conflict of interest found by the Court in its earlier order, so long as the criminal defendant's court debts were at least partly owed to the Judicial Expense Fund." *Id.* at 124.

"In any event, defendants' argument misses the mark. The Fifth Circuit has recognized that not all putative class members must suffer in the same way because of the defendants' conduct; it is enough to show that the same challenged conduct creates the same threat of injury." *Id.* (citing *Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017); and then citing *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) (noting that common questions may "relate to the injurious effects experienced by the class members, but they may also relate to the defendant's injurious conduct")). "Here, as in *Yates*, not all putative class members have suffered or will suffer the same injury. . . . All putative class members face the same *threat* of injury because of the Judges' unconstitutional policy or practice. This is enough to establish commonality . . . ." *Id.* at 125.

For the other part of Count Five, the Court noted that "the Judges' conflict of interest[] [did] not necessarily affect every member of the proposed class," so the Court divided the proposed

class "into one subclass, comprising persons whose debts are at least partly owed to the OPCDC Judicial Expense Fund." *Id.* "All such persons' claims depend upon the common contention that the Judges' conflict of interest violates due process, a contention that is clearly capable of classwide resolution. Thus, plaintiffs have shown commonality with respect to the second part of Count Five." *Id.*

***3. Analysis***

Having carefully considered the matter, the Court finds that the requirement of commonality is met. Plaintiff raises a number of common questions of law and fact, including: (a) "Whether Defendant Sanders has a policy of assessing the maximum amount of fees authorized in eviction proceedings under state law;" (b) "Whether Defendant Sanders's compensation is derived in part from filing fees and writ of execution fees in eviction proceedings;" (c) "What percentage of Defendant Sanders's compensation is paid from the government, eviction filing and writ of execution fees, and other sources;" (d) "Whether Defendant Sanders's use of filing fees and writ of execution fees that he collects in eviction proceedings to pay for his salary creates a personal financial conflict of interest that violates the Due Process Clause;" (e) "Whether the differences in appellate rights that tenants are entitled to in district court, city court, and before a justice of the peace court create a classification based entirely on which court the landlord chooses to file a petition for eviction;" and (f) "Whether there is a rational basis for these differences in appellate rights and, if not, whether those differences violate the Equal Protection Clause." (Doc. 39-1 at 31–32.)

All of these questions are "of such a nature . . . that determination of . . . truth or falsity will resolve . . . issue[s] that [are] central to the validity of each of the claims in one stroke." *Lewis*, 324 F.R.D. at 169 (citations omitted). As *Brown* stated, the due process claim is levelled at the

system, not the individual judge." *Brown*, 637 F.2d at 284. Plaintiff pleads that, at its heart, the "civil justice court fee system presents a 'possible temptation to the average man as judge', making it difficult, if not impossible, for judges to hold the balance 'nice, clear and true' between plaintiff and defendant." *Id.* at 286. In essence, Plaintiff alleges that the "Justice Court Judge . . . has an unconstitutional pecuniary interest in favoring plaintiffs who file civil suits in his court to this extent, and [that] this portion of [Louisiana's] fee system cannot withstand the test of the [*Tumey*] rationale." *Id.* And, for the other claim, the key question is whether appeals are "granted to some litigants and capriciously or arbitrarily denied to others without violating the Equal Protection Clause." *Lindsey*, 405 U.S. at 77. These are the common issues running through each putative class member's claims: whether there are constitutional deficiencies inherent in the Defendant's court that cause due process and equal protection violations to all those who appear before Defendant.

Moreover, *Cain* demonstrates that the individual differences between the putative class members do not matter. Defendant's conduct "create the same risk of injury regardless" of each putative class members' particular circumstances. *Cain*, 327 F.R.D. at 123. That is, "[a]ll putative class members face the same *threat* of injury," *id.* at 125: a system built on an allegedly unconstitutional conflict of interest and infirm appeal process.

For all these reasons, the Court finds that the commonality requirement is met.

### D. Typicality

#### *1. Parties' Arguments*

Plaintiff asserts that she "satisfies the typicality requirement with respect to the Class's claims because her claims and the proposed Class's claims are based on the same factual circumstances, including the same causes of harm; the same legal theory; and the same remedy." (Doc. 39-1 at 34.) As to the facts, Defendant himself recognized that Plaintiff had a typical

eviction: the landlord had a choice of where to file, paid the same filing fees ("which were distributed between Defendant Sanders, his wife (the clerk), and the constable"), and Sanders could use his share of the fees in his discretion for court operations or "personal use," just like in other eviction case. (*Id.* at 34–35.) For the legal theory, Plaintiff experienced the same due process violation that putative Class members will endure: "the absence of a fair and impartial decisionmaker." (*Id.* at 35.) Moreover, as to the Equal Protection Clause, both Plaintiff and the Class members "have fewer appellate rights than similarly situated tenants who face eviction before a city court or district court." (*Id.*) "As a result, both Ms. Rushing and the putative Class seek to redress the same legal injuries through the same legal theories common to the entire Class." (*Id.*) Plaintiff again relies on the Eastern District decision in *Cain* on this issue. (*Id.* at 35–36.)

Defendant responds that "Rushing's claims arise from highly individualized circumstances—her medical disability, income, and specific lease disputes. Many absent tenants will not share these features." (Doc. 53-1 at 17.) Defendant then highlights certain facts in the record, including the fact that Plaintiff vacated her home before the eviction hearing and that "her landlord voluntarily dismissed the petition against her." (*Id.*) Other class members will not be exposed to the unique mootness and standing issues Plaintiff faces. (*Id.*) Courts have held that typicality is lacking where a representative is subject to a unique defense. (*Id.* at 17–18 (citing *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002); *Miller v. Grand Canyon Univ., Inc.*, 540 F. Supp. 3d 625, 635 (N.D. Tex. 2021)).)

Plaintiff replies that Defendant's position is undermined by Defendant's own deposition testimony; again, Sanders stated that Plaintiff's eviction was in fact typical. (Doc. 68 at 7–8.) Plaintiff reiterates many of the same facts she did in her original brief. (*Id.* at 8.) Plaintiff emphasizes that she is not trying to "relitigate any individual eviction decision;" rather:

> She is requesting forward-looking declaratory relief that Louisiana's funding and appellate structures for justices of the peace violate due process and equal protection. At the time she filed her Amended Complaint, Ms. Rushing suffered the same constitutional deprivations under the Due Process Clause and Equal Protection Clause as every other Class member: the absence of a fair and impartial decisionmaker due to Sanders's financial conflict of interest and fewer appellate rights than similarly situated tenants facing eviction before a city or district court judge.

(*Id.*) Plaintiff then relies upon different cases in which classes were certified despite members presenting unique facts and defenses. (*Id.* at 9 (citing *Cain*, 327 F.R.D. at 123–24; *Caliste v. Cantrell*, No. 17-6197, 2018 WL 1365809, at *2 (E.D. La. Mar. 1, 2018); and *Brown*, 637 F.2d at 274 n.3).)

### ***2. Applicable Law***

This Court has explained:

> As to typicality, "Rule 23(a) requires that the named representatives' claims be typical of those of the class." [*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007).] Prior to *Wal–Mart*, the typicality test was "not demanding." [*Cole*, 2016 WL 3258345, at *8 (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)).] The extent to which *Wal–Mart* changed the threshold for typicality in unclear. The Court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." [*Wal–Mart*, 131 S. Ct. at 2551 n.5.] As the Fifth Circuit has described it, "typicality is commonality addressed from the perspective of the named plaintiffs. Commonality requires showing that, in fact, all members of the proposed class share a common claim. . . .Typicality requires showing that, in fact, the proposed representatives have that claim." [*M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013).] The claims of all class members need not be identical. [*Cole*, 2016 WL 3258345, at *8 (citing *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)).] However, typicality demands that claims "arise from a similar course of conduct and share the same legal theory." [*Id.*]

*Lewis*, 324 F.R.D. at 169. Or, as the Fifth Circuit has said:

> A complete identity of claims is not required; rather, the critical inquiry is whether the named plaintiff's claims have the same

> essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

*Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) (cleaned up).

"Although the class representative's claim does not need to be factually identical with the class members, 'class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Miller*, 540 F. Supp. 3d at 635 (quoting *Bridge v. Credit One Fin.*, 294 F. Supp. 3d 1019, 1033 (D. Nev. 2018)). "Specifically, a defense or counter claim defeats typicality if it is likely to become the litigation's focus." *Id.* (citing, *inter alia*, *Zachery v. Texaco Expl. & Prod., Inc.*, 185 F.R.D. 230, 240 (W.D. Tex. 1999) ("Where unique defenses against a named plaintiff exist, the Court must consider the potential danger that the attention to this individual defense might harm the class.").

Thus, for instance, in *Miller*, the district court found typicality lacking because the named plaintiff's "claims depend[ed] on purported misrepresentations made to her, orally, during an individualized conversation regarding her unique circumstances" and because she had "not identified any uniform representation or misrepresentation to the proposed class through which to tie her experience to those that others might have had." *Id.* Moreover, the named plaintiff was "subject to a unique defense" because "the controversy surrounding whether [she] left [the defendant university] of her own accord or whether she was expelled due to a failed background check leads to a unique dispute as to whether she has standing." *Id*. Though plaintiff had standing, the "issue of Miller's expulsion nevertheless poisons class certification," and, for the same reasons, the court found that plaintiff failed to show predominance. *Id.* at 636–37.

However, courts faced with conflict-of-interest cases have found that typicality was met. For instance, in *Cain*, one of the claims "challenge[d] defendants' practice of failing to conduct an

ability-to-pay inquiry and defendants' conflict of interest in evaluating ability to pay—both of which [were] generally applicable to the putative class members." *Cain*, 327 F.R.D. at 125 (citing *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993) (finding typicality satisfied where plaintiff "framed her challenge in terms of [defendant's] general practice of overestimating social security benefits")). "Indeed, the named plaintiffs' claims for declaratory relief [were] identical to those of the other putative class members." *Id.* Thus, typicality was satisfied. *Id.*

Likewise, in *Caliste*, again, plaintiffs filed suit attacking a magistrate judge's "allegedly unlawful practice of imposing unreasonably expensive secured financial conditions of release upon arrestees without inquiring about their ability to pay." *Caliste*, 2018 WL 1365809, at *1. Plaintiffs claimed, *inter alia*, an "institutional financial conflict" which "violate[d] the Due Process and Equal Protection clauses of the Fourteenth Amendment." *Id.* Judge Fallon found:

> Commonality is satisfied because the claims of each class member rest on common fact questions surrounding Defendant's policies and practices of setting bail in state criminal cases. Further, the claims share a common question of law: whether these policies and practices violate the Fourteenth Amendment's Due Process and Equal Protection clauses. Typicality is met because the claims of the named plaintiffs are typical of, if not identical to, the claims as well as the defenses of the class. *See* [*Mullen*, 186 F.3d] at 625 (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (holding that a plaintiff's claim is typical if it arises from the same event or practice giving rise to the claims of other class members and is based on the same legal theory as the class members); *see, e.g.*, R. Docs. 87-3, 87-4 (transcripts from Judge Cantrell's hearings).

*Id*. at *2. The court granted certification despite defendant's claims that the case was moot:

> While the Court encourages Judge Cantrell to continue pursuing settlement of these issues by agreeing to conform his bail practices to the requirements of Constitutional law, the Court has seen no formal recorded statement, such as a consent judgment or settlement agreement, of such a commitment and no evidence that such practices and procedures have already been changed. Therefore, it

> is not absolutely clear that the allegedly unconstitutional bail practices will not recur.

*Id.* at *3.

In sum, the typicality "requirement depends 'less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims.'" *Cain*, 327 F.R.D. at 125 (quoting *Ibe*, 836 F.3d at 529 (quoting *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 472 (5th Cir. 1986))). "A typicality inquiry may be used to 'screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present.'" *Id.* (quoting 7A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1764 (3d ed. 2018)).

### ***3. Analysis***

Having carefully considered the matter, the Court finds that the typicality requirement has been met, for many of the reasons given above. Preliminarily, Defendant testified extensively about the many similarities between Plaintiff's time in Defendant's court and other eviction cases: (a) the process by which the petition was filed was the same as in other cases, (b) the same paperwork was used, (c) it was served the same way, (c) the landlord was charged the same fee as in other cases, (d) the case proceeded on the same timeline as in other cases, (e) the hearing was scheduled for about a week out like in other cases, (f) the landlord had the same option to file in district court, and (g) the hearing was set for the same location as in other cases. (Sanders Dep. 219–21, Doc. 44-1.) Thus, the same procedures were followed in every aspect of filing and setting the case for hearing as in other cases, and those procedures were dictated by state law. (*Id.* at 221.) Moreover, the landlord paid a fee that was allocated and disbursed between Sanders's office, the constable's office, and the clerk, as in other evictions. (*Id.*) Sanders's portion was deposited into his account and made available for personal use. (*Id.* at 221–22.) Plaintiff's landlord's petition

sought relief for nonpayment of rent, which, Sanders guessed, was 95% of the cases filed in his court. (*Id.*)

Defendant argues that Plaintiff's claims differ in a significant way—namely, that she voluntarily dismissed her claim—but Defendant misses the mark. The heart of Plaintiff's claims is exactly what has been established throughout this opinion, from the standing and mootness analysis to commonality and now typicality: that Defendant's court allegedly labored under an inherent unconstitutional conflict of interest, which violated the Due Process Clause, and Plaintiff had fewer appeal rights than similarly situated tenants who face evictions in city court or district court, in violation of her rights under the Equal Protection Clause. And in this critical respect, Plaintiff's claims are identical to those of the putative class members, just like in *Cain* and *Caliste*.

Thus, Plaintiff's claims "arise from a similar course of conduct and share the same legal theory," and so she satisfies the standard for typicality. *Lewis*, 324 F.R.D. at 169. That is, "the [named plaintiff's] claims have the same essential characteristics of those of the putative class." *Angell*, 67 F.4th at 736. In short, this element is met.

**E. Adequacy**

***1. Parties' Arguments***

Plaintiff next argues that she will adequately represent the class and that her attorneys are qualified to serve as class counsel. (Doc. 39-1 at 36.) Plaintiff maintains that she "has conveyed the requisite knowledge and commitment here," as shown by her participation in discovery, review of the pleadings, concern for the potential class members, and communication with her attorneys. (*Id.* at 37.) Plaintiff also understands the purpose of her lawsuit and nature of her claims. (*Id.*) She likewise comprehends that this suit is a class action and what that entails for her as class representative. (*Id.* at 38.) Plaintiff has no conflict of interest with the class members. (*Id.* at 39.)

Her attorneys are "fully qualified and prepared to pursue this action on behalf of the proposed Class as required by Rule 23(g)," as they are experienced in handling class actions and civil rights cases and have sufficient financial and human resources to do so. (*Id.*)

Defendant responds that adequacy is not met. (Doc. 53-1 at 18.) First, "Plaintiff George has effectively abandoned her participation in this litigation against Defendant Sanders. She has failed to make herself available for deposition and has ceased communication with her counsel following discussions regarding the possible dismissal of her claims." (*Id.* at 18–19.) Second, Plaintiff Rushing fails "because she has suffered no injury." (*Id.* at 19.) Defendant reiterates his position—Rushing evacuated the premises before a judgment was rendered; her eviction proceeding was dismissed; she suffered no judgment of eviction, writ of possession or fines; and there was nothing for either party to appeal from. (*Id.*) Rushing's case is closed, but "[o]ther tenants of the putative class, however, may wish to negotiate settlements, pursue appeals, or raise lease-specific defenses. These diverging interests also defeat adequacy." (*Id.*)

Plaintiff Rushing replies first: "Plaintiff George has not moved for class certification or to represent the Class." (Doc. 68 at 10 n.14.) As to Rushing herself, she says Defendant's "arguments go to standing and mootness, not adequacy of representation." (*Id.* at 10.) Plaintiff reiterates her standing arguments before asserting: "mootness and adequacy are 'separate issues' and [] plaintiffs with moot claims may adequately represent a class." (*Id.* (quoting *J.D. v. Azar*, 925 F.3d 1291, 1313 (D.C. Cir. 2019)). *See also id.* at 10–11 (discussing *Sosna v. Iowa*, 419 U.S. 393, 402 (1975)).) Named Plaintiffs can represent the class as long as there is a live controversy; otherwise, the "inherently transitory" exception would be nullified. (*Id.* at 11 (citations omitted).) Instead, the key focus is whether Plaintiff's interests are aligned with those of the class and whether her attorney has the resources and will to serve as attorneys for the class. (*Id.* (citing *Lewis v. U.S.*

*Parole Comm'n*, 743 F. Supp. 3d 181, 202 (D.D.C. 2024)).) Defendant does not contend that Plaintiff labors under a conflict, and she showed extensively in her opening brief how she and her attorneys will adequately represent the class. (*Id.* at 11–12.)

***2. Law and Applicable Law***

Preliminarily, Plaintiff Rushing makes no effort to argue that Plaintiff George is an adequate representative. Indeed, as noted above, George has been dismissed from the case. This is, to the Court, a non-issue.

Again, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "A court considers three factors when adjudging the adequacy of named plaintiffs:"

> (1) the zeal and competence of the representatives' counsel; (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent.

*Angell*, 67 F.4th at 737 (cleaned up). As one reported district court decision in this circuit stated:

> The Fifth Circuit has identified a "generic standard" that applies to the adequacy requirement for class representatives, under which "the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir. 2005). This standard is not "exacting"; it is sufficient that the class representatives "have a general understanding of their position as plaintiffs with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendants." *Hamilton v. First Am. Title Ins. Co.*, 266 F.R.D. 153, 164 (N.D. Tex. 2010), *vacated on other grounds*, 423 Fed. Appx. 425 (5th Cir. 2011). "[C]lass representatives need not be legal scholars and are entitled to rely on counsel," provided that their knowledge about their case is not "limited to derivative knowledge acquired solely from counsel." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 & n. 18 (5th Cir. 2001).

*Steward v. Janek*, 315 F.R.D. 472, 490–91 (W.D. Tex. 2016).

These factors weigh in favor of Plaintiff Rushing and her lawyers. Attorney Micah West's declaration highlights the considerable experience possessed by Plaintiff's counsel in civil rights cases and class actions. (West Decl. ¶¶ 19–30, Doc. 40.) That declaration also summarizes the time and efforts already expended in this litigation. (*Id.* ¶ 31.) They clearly possess the "zeal and competence" to serve as counsel for the representatives.

Rushing herself testified extensively about her understanding of the lawsuit and class action and her willingness to serve as class representative. (Rushing Dep. 29–34, 37–44, Doc. 44-15.) This deposition testimony echoes her declaration, which was summarized above. (Rushing Decl. ¶¶ 21–22, Doc. 28.) Nor does there appear from this testimony any danger of a conflict of interest. (*See id.*) Defendant does not seriously dispute this. And given the fact that this standard is "not 'exacting,'" Rushing has easily shown the sufficient "general understanding of [her] position as plaintiff[ ] with respect to the cause of action and the alleged wrongdoing perpetrated against them by the defendant[.]" *Steward*, 315 F.R.D. at 490 (citations omitted).

Instead, Defendant's argument centers, again, on Plaintiff's alleged lack of standing and the alleged mootness of Plaintiff's case. For many of the reasons given above, the Court rejects this argument.

First, standing was addressed extensively above, and that discussion need not be repeated here. In short, Plaintiff has satisfied the three elements of standing, and there is nothing about that analysis which shows that Plaintiff would be inadequate to represent the class. *See id.* at 492 ("The Court addresses Defendants' standing arguments separately in its Order denying Defendants' motions to dismiss, and rejects Defendants' standing-based adequacy argument for the reasons set forth in that Order.").

As to mootness, the D.C. Circuit provides the proper analysis. In *J.D.*, defendant argued, like Sanders, that plaintiffs were "poorly positioned to vigorously prosecute the class's interests" because their "individual claims [were] moot" so "they thus lack an ongoing stake in the case." *J.D.*, 925 F.3d at 1313. The D.C. Circuit rejected this argument, recognizing: "Mootness alone . . . does not establish their inadequacy as representatives." *Id.* The appellate court continued:

> Though the mootness of named plaintiffs' claims can raise "adequacy concerns," *see* [*DL v. D.C.*, 860 F.3d 713, 726 (D.C. Cir. 2017)], the very existence of the inherently-transitory exception disproves any suggestion that the mootness of a plaintiff's claims necessarily demonstrates her inadequacy as a representative. The entire object of that exception is to allow a class action to proceed even though the inherently fleeting nature of the class's claims will predictably render a given class member's claims moot before the class is certified. Our decisions thus find it "clear that mootness and adequacy are 'separate issues' and that plaintiffs with moot claims may adequately represent a class." *Id.* (alteration omitted) (quoting [*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 407 (1980))]. And the Supreme Court has specifically recognized that a plaintiff with a moot claim may serve as a class representative. *See Geraghty*, 445 U.S. at 404 [ ]; *Sosna*, 419 U.S. at 402–03 [ ].

*Id.* The defendant's only argument for inadequacy was mootness, but "the ostensibly short-lived duration of the representatives' claims only reinforces their inherently transitory nature; it [said] nothing on its own about the representatives' fitness or commitment to prosecuting the action." *Id.* "Indeed, the ephemerality of individual claims makes class-action treatment 'particularly important' so as to 'ensur[e] that a justiciable claim is before the Court.'" *Id.* (quoting *Gratz v. Bollinger*, 539 U.S. 244, 268 (2003) (citation omitted)).

The same reasoning applies here. Defendant's mootness arguments are misplaced and only serve to highlight the importance of the inherently transitory exception. They do not defeat the inadequacy requirement, and the Court instead finds that Plaintiff Rushing adequately represents the proposed class.

### F. Rule 23(b)(2) Certification

#### *1. Parties' Arguments*

Plaintiff next contends that the putative Class satisfies the requirements of Rule 23(b)(2). (Doc. 39-1 at 40.) According to Plaintiff, the rule requires "common behavior by the defendant toward the class" and that "the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (*Id.* (citations omitted).) Plaintiff argues that this case—one seeking "equitable relief" for "allege[d] civil rights violations"—is precisely the type of case for which Rule 23(b)(2) was designed. (*Id.* at 40 (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975), *abrogated by Gardner v. Westinghouse Broad. Co*., 437 U.S. 478 (1978)).) Declaratory relief here would provide relief for every member of the class. (*Id.*) Plaintiff continues:

> All putative Class members face the same harm under the same statutes: they face eviction in front of a judge with a personal and institutional financial conflict of interest and are granted fewer appellate rights than similarly situated tenants appearing in eviction cases before a district court or city court. Because each Class member is harmed in the same way, the requested relief would remedy that harm as to all named and unnamed Class members equally.

(*Id.* at 40–41.) That harm would be remedied by an order declaring unconstitutional both Defendant's conflict of interest and the Louisiana Code of Civil Procedure article governing the unequal appeal rights in Defendant's court. (*Id.* at 41.) Plaintiffs cite *Caliste* and *Cain* as further support for their position. (*Id.* (citing *Cain*, 327 F.R.D. at 126; *Caliste*, 2018 WL 1365809, at *2).)

Defendant responds that this requirement is not met "where relief would require individualized determinations." (Doc. 53-1 at 20 (citing *Wal–Mart*, 564 U.S. at 360).) Again, Rule 23(b)(2) is limited to instances in which "a single injunction or declaratory judgment would provide relief to each member of the class." (*Id.* (quoting *Yates*, 868 F.3d at 367).) Defendant

argues that, here, that is impossible because "declaring Louisiana's fee structure and appellate provisions unconstitutional would not uniformly benefit each tenant. Eviction cases vary based on defenses, landlord behavior, tenant actions, and procedural posture." (*Id.*) According to Defendant, "[r]elief would inevitably require individualized adjudication." (*Id.*)

Plaintiff replies that Defendant's position is undermined by *Brown*: the test is not whether there is "actual judicial prejudice or a direct pecuniary interest in the outcome of particular cases" but rather "whether a fee system presents a 'possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." (Doc. 68 at 12 (quoting *Brown*, 637 F.2d at 282 (quotations omitted)).) Here, "[a]ll tenants in eviction proceedings before Defendants Sanders are subject to the same fee system and appellate structure." (*Id.*) As in *Cain* and *Caliste*, this requirement is met for the due process claim. (*Id.* at 12–13 (citations omitted).) Moreover, "[t]he same is true for Ms. Rushing's equal protection claim, as all class members have fewer appellate rights than similarly situated tenants facing eviction before the city court or district court and there is no rational basis for that distinction." (*Id.* at 13.)

***2. Law and Analysis***

"Rule 23(b)(2) . . . permits class certification where 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. . . ." *Yates*, 868 F.3d at 366 (quoting Fed. R. Civ. P. 23(b)(2)). "[I]nstead of requiring common issues, [Rule] 23(b)(2) requires common behavior by the defendant toward the class." *Id.* (quoting *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012)). "Thus, . . . Rule 23(b)(2) certification is available if three requirements are satisfied: (1) 'class members must have been harmed in essentially the same

way'; (2) 'injunctive relief must predominate over monetary damage claims'; and (3) 'the injunctive relief sought must be specific.'" *Id.* at 366–67 (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)).

Here, Defendant disputes only the first requirement (though the others are certainly met). *See Cain*, 327 F.R.D. at 126. The Supreme Court has said of this rule:

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.

*Id.* at 367 (quoting *Wal–Mart*, 564 U.S. at 360 (cleaned up)).

"Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases in which courts certify classes under Rule 23(b)(2). *Amchem*, 521 U.S. at 614 (citing Adv. Comm. Notes, 28 U.S.C.App., p. 697; and then citing Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 HARV. L. REV. 356, 389 (1967) (subdivision (b)(2) "build[s] on experience mainly, but not exclusively, in the civil rights field")). *See also Jones*, 519 F.2d at 1100 (Rule 23(b)(2)'s "usefulness in the civil rights area was foreseen by the drafters of the revised rule." (citing Advisory Committee's Note, 39 F.R.D. 73, 102 (1966))).

Thus, for instance, in *Cain*, Judge Vance found this requirement met:

> The second aspect of Count Five, challenging the Judges' institutional conflict of interest, involves the same conduct and the same injury for all members of the subclass defined earlier. This conflict of interest may be declared unconstitutional only as to all members of the subclass or as to none of them. Plaintiffs have therefore satisfied Rule 23(b)(2)'s requirements.

*Cain*, 327 F.R.D. at 126. *See also Caliste*, 2018 WL 1365809, at *2 (finding in similar conflict of interest case that plaintiffs "have satisfied the Rule 23(b)(2) standard" because they "request[ed] only declaratory relief for the entire class").

The same analysis applies to the instant civil rights suit. As explained (ad nauseum) above, the claims in this case do not depend on the particular outcomes of individual eviction cases. Rather, Plaintiff's case centers on the alleged unconstitutional conflict of interest under which Defendant's court runs and the disparate appellate rights of class members in justice of the peace court compared to those tenants in district and city courts. *See Brown*, 637 F.2d at 284 ("[O]ur inquiry here is not whether a particular man has succumbed to temptation, but whether the economic realities make the design of the fee system vulnerable to a 'possible temptation' to the 'average man' as judge."); *Lindsey*, 405 U.S. at 77 ("When an appeal is afforded, however, it cannot be granted to some litigants and capriciously or arbitrarily denied to others without violating the Equal Protection Clause."). Defendant's conduct is applicable to the entire Class, and a declaration that this system is unconstitutional will provide relief to all Class members. Thus, this requirement is easily met.

### G. Ascertainability and Overbreadth

#### *1. Parties' Arguments*

Defendant argues in his opposition that the proposed Class is overly broad. (Doc. 53-1 at 20.) Defendant contends that the proposed Class must be "adequately defined and clearly ascertainable," with "[t]he touchstone of ascertainability [being] whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." (*Id.* at 20 (citations omitted).) Defendant asserts: "The class is overbroad because it encompasses individuals who have not suffered, and may never suffer, the alleged

constitutional deprivation. Many tenants appear before the Defendant, pay no costs, experience no adverse ruling, or voluntarily resolve their cases before judgment." (*Id*. at 21.) "Because Plaintiff's definition extends to anyone who might one day appear as an eviction defendant, regardless of whether they experience the challenged harm, it necessarily includes uninjured and speculative members which is precluded by jurisprudence." (*Id.*)

Plaintiff responds that ascertainability is met. (Doc. 68 at 13.) "The proposed Class definition includes all tenants who currently or will in the future be a defendant in an eviction proceeding before Defendant Sanders. The Class members are identifiable through Defendant Sanders's eviction dockets. Defendant Sanders does not argue otherwise." (*Id.*)

Rather, Defendant argues overbreadth, which may not even apply to Rule 23(b)(2) class actions. (*Id.*) In any event, Plaintiff's proposed class should not be narrowed in the way Defendant posits; again, under *Brown*, the key is not whether a tenant suffered an adverse ruling or voluntarily resolved his claim but instead whether the tenant was subject to an unconstitutional system. (*Id.* at 14.)

> In fact, in *Brown*, *Caliste*, and *Cain*, district courts certified classes nearly identical to the proposed Class here, without expressing any doubts about the scope of the proposed Class. Defendant makes no attempt to explain why substantially similar class definitions were appropriate in those cases, but inappropriate here.

(*Id.* at 14 (citations omitted).)

***2. Law and Analysis***

"[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Braidwood Mgmt*, 70 F.4th at 933 n.36 (citation omitted). "Courts traditionally refuse to certify classes that are 'amorphous' or 'imprecise.'" *Id.* (citation omitted). "[T]he requirement that there be a class will not be deemed satisfied unless the class description

is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1760 (4th ed. 2023). "However, the court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." *Seeligson v. Devon Energy Prod. Co., L.P.*, 753 F. App'x 225, 230 (5th Cir. 2018).[6]

Having carefully considered the matter, the Court finds that the ascertainability requirement is met. Here, "Plaintiff[ ] ha[s] demonstrated an administratively feasible method for identifying and ascertaining the class members," *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, 349 F.R.D. 106, 121 (E.D. La. 2025), namely, through the "eviction dockets," (Doc. 68 at 13). The Court agrees with Plaintiff that "Defendant Sanders does not argue otherwise." (*Id.*)

Defendant argues that the class definition is overly broad, but, yet again, this position misses the mark. As stated countless times above, the class is defined not by the individual circumstances of the class members but from the overall alleged unconstitutional structure of Defendant's justice of the peace court—specifically, the alleged conflict of interest and disparate appellate rights. Plaintiff's Class definition captures that to a T, just like the classes in *Brown*, *Cain*, and *Caliste*. *See Brown*, 637 F.2d at 274 n.3 (noting that the district court certified two classes defined as "All persons who on or after June 4, 1971, faced criminal charges, or in the

[6] "Some courts have stated that a precise class definition is not as critical where certification of a class for injunctive or declaratory relief is sought under rule 23(b)(2). Where notice and opt-out rights are requested, however, a precise class definition becomes just as important as in the rule 23(b)(3) context." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004) (citations omitted). Since the various issues related to notice in this case remain unresolved at this point, *see* Fed. R. Civ. P. 23, advisory committee notes on 2003 amendment (stating that "[t]he present rule expressly requires notice only in actions certified under Rule 23(b)(3) "but that [m]embers of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice" and that "[t]he authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care"), the Court makes its ruling on this issue under the assumption that notice will be required. That is, no special weight has been given to Plaintiff because notice may not issue in this case.

future will face criminal charges in the Justice of the Peace Courts in the State of Mississippi" and "[a]ll persons who on or after April 2, 1972, were sued as defendants, or in the future will be sued as defendants in civil suits in Justice of the Peace Courts in Mississippi."). *See also Cain*, 327 F.R.D. at 127 (certifying class of "all persons who owe or will incur court debts arising from cases adjudicated in OPCDC" and "all class members whose debts are at least partly owed to the OPCDC Judicial Expense Fund"). *See also Caliste*, 2018 WL 1365809, at *3 (certifying case where plaintiff sought "a declaratory judgement that Defendant's bond policy, which results in the creation of a modern 'debtor's prison,' [wa]s a violation of Plaintiffs' constitutional rights, and a declaration that Defendant's financial conflict of interest violates their Due Process rights" in part because "Defendant applies the same allegedly unconstitutional practices to the entire class . . ."). The Court agrees with Plaintiff that there is nothing different about this case. As a result, the Court rejects Defendant's overbreadth argument and finds that the ascertainability requirement has been met.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss for Lack of Subject Matter Jurisdiction* (Doc. 53) filed by Defendant Steven E. Sanders, in his official capacity as East Baton Rouge Parish Ward 3, District 2 Justice of the Peace, is **DENIED**.

[*continued on next page*]

**IT IS FURTHER ORDERED** that the *Motion for Class Certification* (Doc. 39) filed by Plaintiff Johnnie Rushing is **GRANTED**, and the following class is certified: "All tenants who currently or will in the future be a defendant in an eviction proceeding before the Justice of the Peace for Ward 3, District 2 in East Baton Rouge Parish, Louisiana."

Signed in Baton Rouge, Louisiana, on September 25, 2026.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**